

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-09-00016-CR

_____

PAUL EDWARD LAMMONS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 173rd Judicial District Court
Henderson County, Texas
Trial Court No. B-15,975

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

After a Henderson County[1] jury found Paul Edward Lammons guilty of aggravated robbery, Lammons submitted the issue of punishment to the trial court. After a hearing on punishment, the trial court found the two enhancement allegations to be true, sentencing Lammons to forty-five years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice and restitution of $10,320.75. On appeal, Lammons challenges the legal and factual sufficiency of the evidence to sustain the conviction, and further complains that in closing arguments to the jury, the State was permitted to shift the burden of proof. We affirm.

## I.    FACTUAL AND PROCEDURAL HISTORY

During the day prior to the evening of the assault on him on August 7, 2007, seventy-six-year-old Mitchell Manning led a routine life set by the demands of his Shady Oaks Mercantile Convenience Store and his trucking company (a small enterprise mostly involved in transporting rocks, sand, and soil). The store opened at 7:00 a.m. and closed at 8:00 p.m. In addition to working in the store, Manning counted the money every night and placed it in a pouch for deposit the next morning. After completing his routine on August 7, Manning closed the store at about 8:10 or 8:15 and made the short, four-mile drive to his home in his white Dodge pickup truck.

---

[1]This case was transferred to this Court from the Twelfth District Court of Appeals in Tyler as a part of the Texas Supreme Court's docket equalization program. We are not aware of any conflict between the precedent of the Tyler Court with precedent of this Court on any issue relevant to this appeal. See TEX. R. APP. P. 41.3.

Manning had the trusting habit of never locking the doors to his home. On August 7, this proved to be a bad habit. As he entered his front door, Manning discovered it to be partially blocked, a blocking which Manning initially believed to be caused by his dog, which stayed in the house. Instead of discovering the dog at the door, Manning was faced with a tall man in a ski mask, holding a gun. The masked man slammed the door into Manning, grabbed him, and then kicked him into a glass gun case. Shards of the gun case's shattered glass lacerated Manning's hands and abdomen, causing him to bleed. The intruder shoved his left knee onto Manning's back and placed a revolver to Manning's head. At that point, a second, smaller intruder donning a ski mask appeared in Manning's sight. Together, the intruders stood Manning up and told him they only wanted his money. They moved Manning to the den, laid him face down, grabbed his keys, pocket knife, passport, and wallet, and tied his hands behind his back with a phone charger cord and electrical tape. Holding the pistol to his head, the intruders threatened Manning's life, moved him into the master bedroom, and asked him whether he had any more guns in the home. Manning reported to them that there was a Smith and Wesson revolver under the pillow on the bed, a .12-gauge shotgun in the closet, and a shotgun, rifle, and pistol in the pickup Manning had been driving. The intruders tied Manning's feet with duct tape and forcefully pushed him backward into the closet, where his head was slammed into the rear wall, causing him to begin bleeding from an abrasion or cut suffered from the blow. The taller intruder informed Manning that "she" (referring to the other, smaller intruder) was going to start the truck and that he would shoot if he heard Manning trying to escape

from the closet. Manning was left tied up, with blood running down his hands and arms, a shard of glass still embedded in his abdomen, and a bleeding, injured head.

When the house fell silent, Manning slipped the electrical tape off of his hands, crawled to the window, saw that his pickup truck was gone, and quickly inventoried the items missing from his home. He determined that the intruders had stolen his guns, pocket knife, billfold with his driver's license, social security and medicare cards, $600.00 in cash, and credit cards, in addition to his ostrich-skin boots, cell phones, money he had brought from the convenience store (including coins placed in a plastic bag), and a jewelry box containing wedding rings, necklaces, and silver dollars. Because the robbers had taken his cell phones, Manning had no means to report the incident from his home. He walked to one of his large trucks used for hauling rocks and gravel and drove from his home to the highway, where he hailed a passing pickup truck and had its driver call the police. The driver of the pickup truck took Manning to his home, where the good Samaritan and his wife cleaned Manning up. Manning's daughter (who had been contacted) retrieved Manning and returned him to his own home.

Officer Kevin Adair arrived and observed that Manning was shaken, scared, upset, and that he had blood on his hands and abdomen. At Adair's recommendation, an ambulance was called and Manning was taken to the hospital.

In an interview with investigator Wilford Gabbard, Manning described the tall intruder as being between six feet and six feet five inches tall, with a medium build, while the shorter intruder

4

stood between five feet ten inches and six feet tall, having a skinny, petite build. Because Manning believed that his dog's behavior toward the intruders indicated that they were familiar to him, he initially suspected Jeremy Costlow, his former employee who had lived with Manning's daughter and tried to rob him once before, as being the shorter of the two assailants.[2]

A little over six hours after the robbery took place, off-duty Bell County deputy sheriff Curtis Nichols was performing security patrol work for a car dealership when he spotted a white Dodge pickup driving through the lot. Since the dealership was closed for the night, the presence of the vehicle aroused his suspicion, so he stopped it. Lammons was driving the truck, and Julie Rigsby was a passenger. In response to Nichols' request, Lammons produced a driver's license. When Nichols conducted a computer search of the license plate number on the truck, the results showed the vehicle as being reported stolen from Manning. This caused Nichols to look more closely at the driver's license which Lammons had produced and Nichols noticed that the photograph on the license was not a picture of Lammons; the license which Lammons had produced was one issued to Manning. When Nichols informed Lammons that the vehicle had been reported as stolen, Lammons attempted to explain the report away by representing "that he was a family member and they had had a fight, and they were upset, and that's why the truck was reported stolen." Nichols' search of the vehicle revealed the pistol, .12-gauge shotgun, and .22 rifle which had been in Manning's truck,

---

[2]Manning also suggested another name, Chad Sorrells, as a potential suspect, but remembered neither the suggestion nor the name at trial.

5

together with a jewelry box, several credit cards issued to Manning, ski masks,[3] three pocket knives, cell phones, and a silver watch. Although Rigsby did not have any money on her person, Lammons possessed $1,131.00 in cash in one pocket, $37.00 in the other, and a plastic bag full of change was in the truck. No Smith and Wesson revolver was located.

At trial, Lammons pointed the finger at the original suspect who Manning had named: Costlow. Costlow's wife, Christy, testified that she knew Rigsby and Lammons, that they were staying at a local park, and that the two stayed the night with the Costlows in their home right behind Manning's store on August 6. Mrs. Costlow believed that neither Risgby nor Lammons had any money at that time because they were homeless, staying in parks or abandoned homes. A few hours before the robbery, they asked to be dropped off at Rose Cemetery, a half mile from Manning's store. At their request, Mrs. Costlow let them out of her car at the cemetery about 6:00 or 6:30 p.m. the evening of the robbery.[4] She claimed that during the time the robbery took place, she was eating dinner with her husband at a local restaurant, a place where they remained together until 11:00 p.m.

Mr. Costlow is six feet tall and weighs 155 to 180 pounds. Lammons is six feet two inches tall and weighs 155 pounds. Gabbard testified there was no evidence linking Mr. Costlow to the crime and opined that Mrs. Costlow did not fit the description of either assailant as given by Manning. Nevertheless, he was of the opinion that the Costlows were somehow involved in the

---

[3]The ski masks were not logged on the evidence list.

[4]Mrs. Costlow's testimony placed Lammons and Rigsby about four and a half to five miles from Manning's home two hours before the robbery.

robbery as well. There were several items stolen from Manning which were not recovered from the truck during Lammons' arrest, and the investigation led police officers to Mr. Costlow's home, where they found a revolver and stolen items from a different burglary. Larry Merritt, an inmate housed in jail with Lammons, testified that Lammons had asked him to provide untrue testimony; Lammons wanted him to tell the jury that he overheard Mr. Costlow say in church that he (Costlow) had stolen the truck. Although Merritt indicated that he had never heard Lammons claim that he stole the truck, Lammons did tell him facts about the robbery and indicated to Merritt that he could not be identified.

On appeal, Lammons complains that the fact that he "was found in the victim's vehicle six hours after the robbery occurred is insufficient" and that the jury's conviction amounted to "no more than mere suspicion, and required the jury to speculate" on the issue of Lammons' guilt. We disagree that this is the only inculpatory evidence that the jury heard and disagree with the conclusion.

## II.      STANDARD OF REVIEW

It is well settled in Texas that Lammons' "unexplained possession of property recently stolen . . . permit[ted] an inference that [he was] the one who committed" the robbery. *Poncio v. State*, 185 S.W.3d 904, 905 (Tex. Crim. App. 2006); *Dixon v. State*, 43 S.W.3d 548, 552 (Tex. App.—Texarkana 2001, no pet.). However, in addition to possession being personal, recent, and unexplained, Lammons must have distinctly and consciously asserted his right to the property for the inference to be warranted. *Dixon*, 43 S.W.3d at 552. In any event, the inference of guilt is not

7

conclusive, and the sufficiency of the evidence must still be examined according to applicable standards of review. *Id.* (citing *Hardesty v. State*, 656 S.W.2d 73, 77 (Tex. Crim. App. 1983)).

Legal and factual sufficiency questions involve separate analyses. The requirement of legal sufficiency serves as a tool to determine whether submission of an issue is required. *Clewis v. State*, 922 S.W.2d 126, 132–33 (Tex. Crim. App. 1996). In other words, if the evidence in this case was insufficient to raise an issue of Lammons' guilt, it should not have been submitted for the jury's decision, and we must render a judgment of acquittal. *Id.* When conducting this analysis, we review all of the evidence in the light most favorable to the verdict and determine whether any rational jury could find the essential elements of the crime beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Lacour v. State*, 8 S.W.3d 670, 671 (Tex. Crim. App. 2000) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Clewis*, 922 S.W.2d at 132-33; *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

Once we determine the evidence raised issues for the jury's resolution, we will not sit as the thirteenth juror re-evaluating the weight and credibility of the evidence. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Instead, we give full play to the jury's responsibility to weigh the evidence, resolve conflicts in the testimony, and draw reasonable inferences from basic facts. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); *Clewis*, 922 S.W.2d at 133; *Bottenfield v. State*, 77 S.W.3d 349, 354 (Tex. App.—Fort Worth 2002, pet. ref'd) (citing *Jackson*, 443 U.S. at 319).

On the other hand, because factual sufficiency is an issue of fact, we are not free to re-weigh the evidence and set aside the jury verdict merely because we feel a different result is more reasonable. *Clewis*, 922 S.W.2d at 135. In reviewing Lammons' claim that the evidence in this case amounted to "no more than a suspicion," we will not engage in a second evaluation of the evidence, but will only ensure that the jury reached a rational decision. *Cuong Quoc Ly v. State*, 273 S.W.3d 778, 783 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (citing *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993)). Thus, we give due deference to its determinations and will find the evidence factually insufficient only when necessary to prevent manifest injustice. *Johnson*, 23 S.W.3d at 8–9, 12; *Clewis*, 922 S.W.2d at 133, 135. Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Hooper*, 214 S.W.3d at 13. As long as the cumulative force of all incriminating circumstances is sufficient to support Lammons' conviction, each fact need not directly point to his guilt. *Id.* (citing *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)).

In contrast to a legal sufficiency review, we examine the evidence in a neutral light when assessing factual sufficiency and determine whether the proof of guilt is obviously weak as to undermine confidence in the verdict, or, if taken alone, is greatly outweighed by contrary proof so as to be clearly wrong and unjust. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Johnson,* 23 S.W.3d at 11; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997); *Harris v. State*, 133 S.W.3d 760, 764 (Tex. App.—Texarkana 2004, pet. ref'd). A clearly wrong and unjust

9

verdict is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Santellan v. State*, 939 S.W.2d 155, 165 (Tex. Crim. App. 1997).

We also measure the evidence "against the elements of the offense with the same kind of analysis as that applied in the test for a hypothetically-correct jury charge for the case."[5] *Ferralez v. State*, No. 06-08-00064-CR, 2009 WL 454335, at \*1 (Tex. App.—Texarkana Feb. 25, 2009, no pet.) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)); *see also Grotti v. State*, 273 S.W.3d 273, 280 (Tex. Crim. App. 2008). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240. It is used to evaluate both legal and factual sufficiency. *Grotti*, 273 S.W.3d at 281.

## III. ANALYSIS

### A. Sufficient Evidence Supported the Rejection of Smalley's Self-Defense Theory

The hypothetically correct jury charge in this case would require the jury to find that: 1) Lammons, 2) intentionally, knowingly, or recklessly, 3) used or exhibited a weapon, or threatened or placed another person of at least sixty-five years of age, 4) in fear of imminent bodily injury or

---

[5]The hypothetically correct jury charge analysis set out in *Malik* is supposed to be conducted "*even in the absence of alleged jury charge error*." *Gollihar v. State*, 46 S.W.3d 243, 255 (Tex. Crim. App. 2001).

death, 5) while appropriating property, 6) without the lawful owner's consent. TEX. PENAL CODE ANN. §§ 29.02, 29.03 (Vernon 2003), § 31.03 (Vernon Supp. 2008).

Here, Lammons spent the night in close proximity to Manning's store and home the night before the robbery. He was found only six hours after the robbery in Manning's truck, carrying a majority of the stolen loot and exhibiting Manning's driver's license. *See Hardesty*, 656 S.W.2d at 77 (found inference of guilt where defendant was found with stolen property fifteen days after it was stolen). Lammons, a man whom Mrs. Costlow had only shortly before the robbery believed to have been virtually penniless, also had a large amount of cash in his pockets. He clearly lied and claimed he was Manning's family member when questioned about the stolen car. He fit Manning's description of the tall intruder, and the testimony of Lammons' cell mate concerning admissions against interest incriminated him. Lammons was with Rigsby prior to the robbery and Manning testified the tall intruder referred to the other intruder during the robbery as a "she." We conclude that the evidence was legally sufficient to submit the question of Lammons' guilt to the jury.

Lammons argues that the evidence was factually insufficient because there was no evidence found in Manning's home that could identify him. He pointed to Mr. and Mrs. Costlow, recounted that Manning's initial suspect was Mr. Costlow based on his dog's reaction to the intruders, and generally questioned law enforcement officers' failure to conduct a more thorough investigation and confirm the Costlows' alibi. Lammons also pointed out that the pistol stolen from Manning's home was not among the possessions found in the truck, that one was later found in Mr. Costlow's home,

11

and that it would be difficult for Lammons to travel the distance between Rose Cemetery and Manning's home on foot in only two hours. It was within the jury's province to resolve any conflicts in the evidence and decide which version of the events to believe. *See Wesbrook v. State*, 29 S.W.3d 103, 111–12 (Tex. Crim. App. 2000). The jury was free to disregard evidence regarding the reaction that Manning's dog had to the intruders and the questions raised by the defense concerning the Costlows' whereabouts on the night of the robbery. When reviewed in a neutral light, we conclude the totality of the evidence was factually sufficient to reasonably convict Lammons. His first and second points of error are overruled.

## B. State's Closing Arguments Were Not Improper

Summation of the evidence, reasonable deduction from the evidence, and answers to arguments of opposing counsel are proper fodder for jury argument. *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex. Crim. App. 1992). Even if a jury argument exceeds the bounds of proper argument, an "erroneous overruling of a defendant's objection is not reversible error unless it affected the appellant's substantial rights." *Montgomery v. State*, 198 S.W.3d 67, 95 (Tex. App.—Fort Worth 2006, pet. ref'd); *see* TEX. R. APP. P. 44.2(b). In determining whether Lammons' substantial rights were affected, we consider the severity of any misconduct, the curative measures, and the certainty of conviction, absent the misconduct. *Montgomery*, 198 S.W.3d at 95; *Martinez v. State*, 17 S.W.3d 677, 692–93 (Tex. Crim. App. 2000). After acknowledging that the police could have further and

12

more thoroughly investigated the robbery and whereabouts of the Costlows (but did not do so), the

State said:

> But you know what? None of that stuff in any way shows that these defendants aren't responsible for their crime. Name one piece of evidence that was brought before you by the State or the defense that shows these defendants are not responsible - -
>
> [DEFENSE COUNSEL]: Judge, I object to that as an attempt to shift the burden of proof by the State.
>
> [STATE]: Judge, I don't have a burden to produce all the evidence, just on these elements. And I'm not shifting the burden of proof.
>
> THE COURT: Overruled.
>
> [STATE]: Any evidence brought forth by the defense or the State that shows that these defendants didn't commit this offense. Anything. Y'all can consider all the evidence. The evidence brought by me, the evidence brought by the defendants.[6]

Lammons argues that these statements shifted the burden of proof to Lammons when the entire burden of proof remained with the State.[7] However, it appears that the State was simply trying to emphasize the point that the testimony which might be favorable to show that the Costlows may have

---

[6]The State also made the following statement which was not objected to and was not made the subject of any motion for new trial: "You know what, there's absolutely no evidence that's been presented at this trial that those defendants got that truck in any way other than the robbery at Mr. Manning's house . . . ."

[7]The State failed to reply to this point of error in its briefing which focused on whether these statements commented on Lammons' failure to testify, which was never addressed in Lammons' brief. "An objection that the State's argument shifts the burden of proof does not comport with an appellate challenge that the State's argument commented on a defendant's failure to testify." *Freeman v. State*, No. 01-05-01181-CR, 2007 WL 14469, at *2 (Tex. App.—Houston [1st Dist.] Jan. 4, 2007, pet. ref'd) (mem. op.) (not designated for publication) (citing *Paster v. State*, 701 S.W.2d 843, 849 (Tex. Crim. App. 1985)).

13

been involved in the robbery in some fashion did not contradict or diminish the proof of Lammons' guilt of the crime. *See Caron v. State*, 162 S.W.3d 614, 618 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Moreover, absent comment on the defendant's lack of testimony, "the State may comment on appellant's failure to present evidence in his favor" during jury argument. *Id.* (citing *Jackson v. State*, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000)); *Sanders v. State*, 74 S.W.3d 171, 173 (Tex. App.—Texarkana 2002, pet. ref'd). Here, when placed in context with the record, the State's jury argument was proper.[8]

---

[8]Nevertheless, curative measures were taken in the form of the court's charge, which stated: "The law does not require a defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant, unless you are satisfied beyond a reasonable doubt of the defendant's guilt . . . ." Absent any evidence to the contrary, we must presume the jury followed the court's charge as given. *Gamboa v. State*, No. AP-75,635, 2009 WL 928552, at *4 (Tex. Crim. App. Apr. 8, 2009); *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). Further, even if there had been erroneous argument, an analysis of jury argument error would require that we weigh three factors to determine if it resulted in harm to Lammons' substantial rights: (1) severity of the misconduct (the magnitude of the prejudicial effect of the State's remarks); (2) curative measures taken (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (strength of evidence supporting conviction). *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (citing *United States v. Millar*, 79 F.3d 338, 343 (2nd Cir. 1996); *United States v. Palmer*, 37 F.3d 1080, 1085 (5th Cir. 1994)). This circumstance would not have met that test for harm.

## IV. CONCLUSION

We affirm the judgment of the trial court.

_____Bailey C. Moseley
Justice

Date Submitted:     July 22, 2009
Date Decided:       July 23, 2009

Do Not Publish