

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-75,635

### JOSEPH GAMBOA Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM CAUSE NO. 2005-CR 7168A IN THE 379th DISTRICT COURT
### BEXAR COUNTY

KELLER, P.J., delivered the opinion of the Court in which MEYERS, PRICE, KEASLER, HERVEY, and HOLCOMB, JJ., joined. COCHRAN, J., concurred in point of error seven and otherwise joined. WOMACK and JOHNSON, JJ., concurred.

In March 2007, appellant was convicted of capital murder and sentenced to death.[1] Direct appeal to this Court is automatic.[2] Appellant raises eighteen points of error. Finding no reversible error, we affirm the conviction and sentence.

---

[1] TEX. PEN. CODE §19.03(a); TEX. CODE CRIM. PROC. art. 37.071. Unless otherwise indicated, all future references to articles refer to the Code of Criminal Procedure.

[2] Art. 37.071, §2(h).

## I. BACKGROUND

### A. The Crime

On the night of June 23, 2005, Ramiro "Ram" Ayala, the owner of a San Antonio bar named Taco Land, was working alongside employees Denise Koger and Douglas Morgan. Shortly after the bar opened, between 10:00 and 11:00 in the evening, appellant and Jose Najera entered the bar. Neither man was known to the employer or his staff. Patrons Paul Mata and Ashley Casas arrived at around 11:30 p.m. They purchased a couple of beers and began a game of pool. Shortly afterwards, appellant approached Paul, introduced himself as "Rick," and asked to play pool. After Paul and Ashley finished their game, appellant and Paul began to play. Another patron, Anita Exon, left around midnight and remembered seeing two Hispanic males who remained at the bar.

At some point during the pool game, appellant approached Ram and began to argue. Appellant then put a gun to Ram's stomach and shot him. Paul and Ashley hid in a nearby closet. Douglas and Denise hid behind the bar, only to be confronted later by appellant. Appellant told Douglas to open the cash register, but he was unable to do so. Appellant then shot him and had Denise open the cash register. After she retrieved the money, appellant demanded any money that was not kept in the register. While Denise was complying, appellant shot her in the back and commenced kicking her in the head. He then picked up Douglas and shot him again.

Shortly afterwards, appellant and Najera left the bar. Denise was able to telephone 911 for help while Paul attempted to render aid to Ram and assist Denise with the phone call. Ram died that same night; Douglas lived for three more weeks before succumbing to his injuries.

### B. Investigation and Evidence

Officer Michael Wesner arrived first on the scene at approximately 1:15 a.m. Investigators

took statements from the three witnesses and collected various items such as pool cues and a beer can thought to have been handled by appellant, as well as spent bullets and samples of blood. Later, he attended a memorial service for Ram where he interviewed several people. The leads he received at the service did not pan out under further investigation.

At some point, Anita Exon told Detective John Slaughter that, based on her belief that Denise had owed a person called "Tiny" money for drugs, "Tiny" might have been involved in this offense. Other leads included a June 25th Crime Stoppers tip regarding a person named Sean Waggoner.

Detective Slaughter testified that he had no reason to think of or discount "Tiny" as a suspect. The only reason he was considered by Detective Slaughter was that Anita mentioned him. Nothing in Denise's account of what happened referred to "Tiny," nor did anything else that came up in the investigation. Sean Waggoner matched the description of one of the assailants, and once he heard that the police where looking for him, he contacted Detective Slaughter. Detective Slaughter then met with Sean, who was cooperative. Sean gave a DNA sample and an alibi for his whereabouts on the night in question. His DNA did not match the DNA taken from the beer can believed to have been used by appellant and his accomplice, and further investigation substantiated his alibi.

On July 2, 2005, Detective Slaughter received a tip from Crime Stoppers regarding the identities of the two assailants, Najera and appellant. Detective Slaughter returned to the hospital that day to show Denise a photo line-up with a picture of appellant. She was not able to identify him as her assailant, but she did point to his picture and that of another person and said that they looked familiar to her. Detective Slaughter showed her another photo array that included Najera, and she was able to identify him as one of the assailants. Detective Slaughter was never able to communicate in any significant way with the other victim, Douglas, before his death.

On the same day, Detective Roy Rodriguez showed Paul a black and white photo array consisting of pictures of appellant and five other men. Paul was able to identify appellant as one of the two men involved in the crime. Three days later, due to a miscommunication between Detectives Slaughter and Rodriguez, the same photo array, but this time in color, was shown to Paul. Once again he identified appellant. Paul was also shown another array, which included Najera's photo, but he was unable to identify him as one of the two offenders.

On July 6, 2005, Detective Slaughter received fingerprint results from the pool cues and beer cans. A fingerprint examiner for the San Antonio Police Department found that the prints from one of the pool cues matched those of appellant.

On June 7, 2006, Detective Slaughter executed a search warrant to obtain a DNA sample from appellant. The next day, appellant's and Najera's DNA were compared to samples from the beer can found at the Taco Land Bar. The results excluded Najera, but did not exclude appellant.

## II. GUILT

### A. Factual Sufficiency of the Evidence

In point of error nine, appellant contends that the evidence at trial, including DNA, eyewitness identification, and fingerprints, was factually insufficient to justify the jury's verdict. Appellant argues that the three witnesses who testified to seeing appellant shoot Ram never positively identified appellant before trial and therefore their in-court identifications are suspect. Appellant also argues that Anita testified that appellant and Najera left the bar before she did, so the DNA and fingerprint evidence collected were not dispositive of guilt. Finally, appellant suggests that Detective Slaughter purposefully ignored other suspects, such as "Tiny" and Sean Waggoner.

DNA evidence from beer cans was consistent with appellant's DNA. Bexar County's forensic

scientist testified that the chance of finding another person with the same DNA profile as appellant's is 1 in 5.95 quadrillion. Also, appellant's fingerprints were recovered from the crime scene, and multiple eyewitnesses identified him as the perpetrator of the crime. During Paul's testimony, there was some confusion as to when he became positive of his identification. Nevertheless, the record indicates that Paul positively identified appellant at the time he reviewed the photo array. The photo array, with his signature behind appellant's photograph, was admitted into evidence as well. Denise testified that once she was out of the hospital and no longer under the influence of medication, she was also able to positively identify appellant.

Appellant also contends that Anita stated that appellant and Najera left before she did. But appellant seems to be referring to what Detective Slaughter testified regarding what Anita had told him, as opposed to her own testimony. Anita testified that she never told him anything of the sort and the two men she saw were still at the bar when she left. The record shows that Detective Slaughter investigated both Sean and Tiny and was able to eliminate them as suspects.

In reviewing a factual sufficiency challenge, we consider all of the evidence in a neutral light and ask whether the evidence introduced to support the verdict, though legally sufficient, is nevertheless so weak or so against the great weight and preponderance of conflicting evidence as to render the jury's verdict clearly wrong and manifestly unjust.[3] Viewing the evidence in a neutral light, we find the evidence factually sufficient to sustain the verdict. Point of error nine is overruled.

## B. Jury Selection

In point of error one, appellant complains that the trial judge erred in dismissing a juror sua sponte when he was not disqualified as a matter of law. Appellant argues that the trial judge

---

[3] *Watson v. State,* 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006).

erroneously relied upon *Brooks v. Dretke* in dismissing the juror.[4] In addition, appellant argues that the harmless error doctrine does not apply due to the Supreme Court's ruling in *Gray v. Mississippi*.[5]

During voir dire, Juror Aulds was arrested for driving while intoxicated. The arrest occurred after the jury was selected, but before it was sworn, and a couple of days before the trial was to commence. Neither the State nor appellant objected to Juror Aulds serving on the jury. But the trial judge believed that because of the Fifth Circuit's ruling in *Brooks v. Dretke*, Juror Aulds should be disqualified or else his inclusion would lead to an eventual overturning of a verdict on appeal. The trial judge believed that the power the District Attorney's office would have over Juror Aulds would influence his ability to be impartial. Appellant objected to the sua sponte dismissal of Juror Aulds. After the dismissal, the trial judge decided to place the already-selected alternate in Juror Aulds' position and continue voir dire with the remaining potential jurors to fill the alternate's spot.

Appellant relies on *Gray v. Mississippi* to support his position.[6] But the Supreme Court has explained that the broad language in *Gray* was too sweeping to be applied literally and should not be extended beyond the context of the "erroneous *Witherspoon* exclusion" of a qualified juror in a capital case."[7] This Court has also held that, when *Witherspoon* error is not at issue, the erroneous excusal of a veniremember will call for reversal "only if the record shows that the error deprived the

---

[4]  *Brooks v. Dretke*, 444 F.3d 328 (5ᵗʰ Circuit 2006) .

[5]  *Gray v. Mississippi*, 481 U.S. 648 (1987).

[6]  *Gray*, 481 U.S. at 665, 668 (citing *Witherspoon v. Illinois,* 391 U.S. 510, 521).

[7]  *Ross v. Mississippi*, 487 U.S. 81, 87 (1988).

defendant of a lawfully constituted jury."[8] Under *Jones*, the question is whether or not the jurors who actually sat were impartial.[9]

In the instant case there is nothing to indicate that the jurors were anything but impartial. Appellant's only complaint regarding the jury is that, because of the erroneous excusal, his ability to have a compatible jury was negated. This is insufficient to show that he was deprived of a lawfully constituted jury. For these reasons, we need not decide whether the trial judge erred in dismissing Juror Aulds. Appellant's first point of error is overruled.

### C. Outburst during trial

In point of error four, appellant alleges that the trial court erred when it denied his motion for mistrial after an outburst by one of the victim's relatives.

During the testimony of a witness for the State, a family member of the victim shouted, "You did this for 200 dollars?" Appellant moved for a mistrial, and the trial court denied his motion. Instead, the court directed the jury that the outburst was made by someone who was not a witness and not under oath. The trial judge further instructed the jury to completely disregard what was said.

The denial of a motion for mistrial is reviewed under an abuse of discretion standard.[10] This Court has long held that conduct by a bystander "which interferes with the normal proceedings of a trial will not result in reversible error unless the defendant shows a reasonable probability that the

---

[8]   *Jones v. State*, 982 S.W.2d 386, 394 (Tex. Crim. App. 1998).

[9]   *Id.* at 391.

[10]   *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).

conduct interfered with the jury's verdict."[11]  Instructions to the jury are generally considered sufficient to cure improprieties that occur during trial.[12]  And we generally presume that a jury will follow the judge's instructions.[13]

Nothing in the record suggests that the outburst was of such a nature that the jury could not ignore it and fairly examine the evidence in arriving at a verdict.  Point of error four is overruled.

### D. Extraneous Offense

In point of error three, appellant argues that the trial court erred when it denied his motion for mistrial after extraneous offense evidence was elicited during the guilt phase of trial.  The complained-of evidence was elicited in the following colloquy between the prosecutor and the witness, Detective Rodriguez:

> Q:  And in fact, on July 2nd after Paul positively identified Joseph Gamboa, this defendant, as the actor or one of the actors, he became emotional, didn't he?
>
> A: Yes, he did.
>
> Q: And he began to cry didn't he?
>
> A: Yes he did.
>
> Q: What did he tell you?

---

[11]  *Landry v. State*, 706 S.W.2d 105, 112 (Tex.Crim.App. 1985); *Ashley v. State*, 362 S.W.2d 847 (Tex.Cr.App. 1963); *Guse v. State*, 97 Tex.Cr.R. 212, 260 S.W. 852 (1924).

[12]  *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998) (jury presumed to disregard parole during deliberation when so instructed); *Waldo v. State*, 746 S.W.2d 750 (Tex. Crim. App. 1988) (jury presumed to follow instruction to disregard testimony regarding defendant's post-Miranda silence); *Gardner v. State*, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987) (jury presumed to follow instruction after accomplice witness alluded to defendant's previous incarceration).

[13]  *Colburn*, 966 S.W.2d at 520.

A: He said he had seen this person in a Crime Stoppers on an unrelated shooting that occurred like the following weekend.

Appellant objected to the testimony and argued that an instruction to disregard would be ineffective. The trial court sustained appellant's objection and gave the jury the following instruction: "As for the last question and answer, if you recall what it was, I'm instructing you to completely disregard it. It has nothing to do with this case or any of your deliberations whatsoever. So just disregard it."

Appellant argues that evidence violated Texas Rule of Evidence 404(b), which states: "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Assuming that the testimony was improper, the trial judge quickly instructed the jury to disregard the statement and the question. Nothing in the record suggests that the jury was unable to follow the instruction. Point of error three is overruled.

**E. In-Court Identification**

In point of error seven, appellant contends that the trial court erred in failing to suppress Paul's in-court identification of appellant. Appellant argues that Paul's in-court identification was influenced by a highly suspect photo array shown to him by police officers during their investigation. Appellant argues that Paul never positively identified appellant as the shooter until a pre-trial hearing where appellant was present in an orange jumpsuit.

Paul was shown three photo arrays during the police investigation. The first, shown on June 28, 2005, consisted of photographs of Sean Waggoner and five random individuals. Paul was unable to identify anyone from that array. The second, shown on July 2, 2005, was a black and white array that included a photo of appellant. After Paul was able to narrow the array down to two individuals, Detective Rodriguez asked Paul to choose the one who most resembled the shooter. Paul was able

to single out and identify the appellant, and he signed his name behind that picture. Due to a miscommunication, three days later, another detective went to Paul with a third photo array, which was identical to the second except that it was in color. Again, Paul identified appellant. In a pre-trial hearing Paul identified appellant as the man who shot and killed Ram. Finally, Paul again identified appellant at trial. The trial court suppressed only the third photo array.

We review *de novo* a trial court's ruling on how the suggestiveness of a pre-trial photo array may have influenced an in-court identification[14] "An in-court identification is inadmissible when it has been tainted by an impermissibly suggestive pretrial photographic identification."[15] We consider the totality of the circumstances in order to determine whether "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."[16] Factors to be considered when making a *de novo* review are: 1) the witness's opportunity to view appellant at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the criminal; 4) the witness's level of certainty at the time of confrontation; and 5) the length of time between the offense and the confrontation.[17]

Even though Paul testified that he hesitated when identifying appellant, there was other testimony to support the contention that Paul gave multiple positive identifications. Police officers

---

[14] *Loserth v. State*, 963 S.W.2d 770, 771-772 (Tex. Crim. App. 1998).

[15] *Id.* at 772.

[16] *Id.* quoting *Simmons v. United States*, 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968). *See also Madden v. State*, 799 S.W.2d 683, 695 (Tex. Crim. App. 1990).

[17] *Neil v. Biggers*, 409 U.S. 188, 199 (1972).

who conducted the array testified to Paul's positive identification of appellant. A few days after the shooting, Paul was watching television and recognized appellant from an unrelated Crime Stoppers commercial regarding another robbery. Paul called the Crime Stoppers hotline when he saw the number come up on the commercial. Also, Paul testified that he played pool with appellant for approximately ten minutes. Paul testified that he based his in-court identification of appellant on his memory of the events that transpired at Taco Land and of Ram's murder. This evidence is sufficient to remove any possible taint from the excluded third photo array. The trial court did not err in admitting evidence of Paul's in-court identification of appellant. Point of error seven is overruled.

## F. Jury Unanimity

In point of error two, appellant contends that he was denied his right to a unanimous jury verdict. He claims that the jury was allowed to convict him based upon two distinct and separate theories within the capital murder statute without having to unanimously agree which one was applicable. He acknowledges prior cases that permit the disjunctive charging of alternate methods of committing capital murder, but he argues that those cases are distinguishable because the different means of committing capital murder in those cases were contained within the same subsection of the statute, while the different legal theories of capital murder in his case are found in different subsections.

Appellant was charged in a two-paragraph indictment. The first paragraph alleged that appellant caused the death Ram by shooting him with a firearm while committing or attempting to commit the offense of robbery of Ram, Douglas, and Denise. The second paragraph alleged that appellant caused the death of Ram and murdered Douglas during the same criminal transaction..

In *Kitchens v. State*, we held that the disjunctive submission of two theories of capital murder

with two different aggravating elements (the underlying offenses of robbery and aggravated sexual assault) did not violate the right to a unanimous verdict because the different theories were simply alternate methods of committing the same offense.[18]  It is true that the alternate theories of capital murder in *Kitchens* involved aggravating elements that were listed within a single subsection of the capital murder statute.[19]  Nevertheless, in *Kitchens*, we explained generally that alternate theories of committing the same offense may be submitted disjunctively in the jury charge without violating the right to jury unanimity.[20]  In answering a claim that the State should have elected between different theories of capital murder that *did* involve aggravating elements that were contained in different subsections (murder in the course of robbery and burglary and murder for hire),[21] we held in *Hathorn v. State* that no election was required because the indictment charged only one offense.[22]  For this reason, we rejected the defendant's reliance upon the severance statute because that statute applied

---

[18]   823 S.W.2d 256, 258 (Tex. Crim. App. 1991); *see also Martinez v. State*, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004).

[19]  *See* TEX. PENAL CODE §19.03(a)(2)("A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and . . . the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat under Section 22.07(a)(1), (3), (4), (5), or (6).").

[20]   823 S.W.2d at 258; *see also Martinez*, 129 S.W.3d at 103 (question is whether the disjunctive submission involves "alternative theories of committing the same offense, in contrast to instructing the jury on two separate offenses involving separate incidents").

[21]  *See* TEX. PENAL CODE §19.03(a)(2)(robbery and burglary), (3)("the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration").

[22]   848 S.W.2d 101, 113 (Tex. Crim. App. 1992).

only when two or more offenses have been consolidated or joined for prosecution.[23]

In *Graham v. State*, we addressed a complaint that the trial court erred in denying a motion to sever where the defendant's claim was that different theories of capital murder (where the aggravating elements were in fact codified in different subsections) were different offenses.[24] Three different theories were at issue: (1) the murder of Hurtado in the course of robbing him, (2) the murder of Hurtado during the same transaction in which the defendant also murdered Giraldo, and (3) the murder of Garcia-Castro in the course of robbing him.[25] The Court held that the first two theories, which involved Hurtado as the victim of the predicate murder, were the same offense, but the third theory, involving a different victim for the predicate murder, was a different offense that should have been severed.[26] Here, we face the same factual situation presented by *Graham*'s first two theories of capital murder: the victim of the predicate murder is the same (Ram), and the predicate murder is aggravated by the elements of robbery and an additional murder.

We explained in *Huffman v. State* that two "closely intertwined strands of our jurisprudence" – jury unanimity and double jeopardy – "address the same basic question": whether "different legal theories of criminal liability comprise different offenses" or "alternate methods of committing the same offense."[27] Comparing the jury unanimity case of *Kitchens* to the double jeopardy case of *Ex*

---

[23] *Id.*

[24] 19 S.W.3d at 851, 852 (Tex. Crim. App. 2000).

[25] *Id.* at 854.

[26] *Id.*

[27] 267 S.W.3d 902, 905 (Tex. Crim. App. 2008).

*parte Ervin*,[28] we observed that the rule for homicide offenses appeared to be that "different legal theories involving the same victim are simply alternate methods of committing the same offense."[29] In *Ervin*, we included in our discussion of "murder variations" the occurrence of different legal theories in the capital murder context, and we observed that the prevailing view was "that a trial court cannot impose multiple convictions and sentences for variations of murder when only one person was killed."[30]

We conclude that our holding in *Kitchens* applies equally to all alternate theories of capital murder contained within §19.03, whether they are found in the same or different subsections, so long as the same victim is alleged for the predicate murder, as was the case here. Point of error two is overruled.

### III. PUNISHMENT

### A. Outside Influence Upon Jurors

*1. Juror Harcek*

In point of error five, appellant claims that Juror Harcek was exposed to improper influence when he overheard a conversation between Police Officer Breen and a prosecutor who was not involved in the case.

Juror Harcek was in the courthouse elevator when Officer Breen entered and the prosecutor asked where he was headed. Officer Breen responded, and asked if the jury took all of forty-five minutes to come back with a verdict. The prosecutor then told him it took four hours, after which

---

[28] 991 S.W.2d 804 (Tex. Crim. App. 1999).

[29] Id. at 807.

[30] *Id.*; *see also id.* at 807-11 (citing and discussing cases).

Juror Harcek asked them to be quiet. Officer Breen saw Juror Harcek's juror badge and apologized, riding the rest of the way up the elevator with no further discussion regarding the case. Juror Harcek testified that all he heard was someone mention the Taco Land case, at which point he asked them to be quiet and they did. He did not hear anything relating to evidence in the case or deliberations. He further testified that he would still be able to be an impartial juror. The judge then admonished Juror Harcek not to discuss what happened with any of the other jurors, to disregard the comment when deliberating, and he asked, multiple times, if the comment would affect his ability to be impartial, to which Juror Harcek said it would not.

A trial court's denial of a motion for mistrial is reviewed for an abuse of discretion.[31] When a juror has a conversation with an unauthorized person about the case on which he is serving, there is a rebuttable presumption that injury has occurred and a new trial may be necessary.[32] An appellate court should defer to the trial court's findings of facts regarding the credibility and demeanor of the witnesses, viewing the evidence in the light most favorable to the trial judge's rulings.[33] In this case the juror was not even involved in the conversation; he merely overheard it. Given Juror Harcek's testimony, we hold that the trial court did not abuse its discretion in denying the request for a mistrial. Point of error five is overruled.

*2. Juror Lincoln*

In point of error six, appellant claims that the trial court erred when it denied his motion for mistrial after it was discovered that Juror Lincoln's seventeen-year-old son was arrested while she

---

[31]  *Ladd,* 3 S.W.3d at 567.

[32]  *Quinn v. State*, 958 S.W.2d 395, 401 (Tex. Crim. App. 1997).

[33]  *Id*. at 402.

was serving on the jury. Because Juror Lincoln's son was arrested in Bexar County and the same District Attorney's office that was prosecuting the case at hand would also be prosecuting her son's case, appellant claims that her son's arrest would unduly influence her ability to be fair and impartial.

After the guilt phase of the trial but before the punishment phase, Juror Lincoln informed the court that over the weekend her son had been arrested for interfering with the duties of a public servant, evading arrest, and failure to identify. The trial judge asked Juror Lincoln whether or not her son's arrest would affect her ability to pay attention to the evidence and if she could set aside what happened to her son. She responded that it would not affect her ability to pay attention, nor would it prevent her from being impartial. The judge also asked her if she could set aside what happened, to which she responded that she could. Juror Lincoln also informed the judge that her son was being "stupid" and she had let him stay in jail because he needed to "learn a lesson." Juror Lincoln repeatedly testified that she would have no trouble being fair and that her son's arrest would not affect her in any way for the remainder of the trial. She testified that she knew that her son was running with a bad crowd and it was her choice to leave her son in jail to teach him a lesson.

Viewed in the light most favorable to the trial court's ruling, we find that the evidence supports the trial court's denial of appellant's motion for mistrial. Point of error six is overruled.

### B. Cumulative impact of first seven errors

In appellant's eighth point of error he contends that, cumulatively, errors one through seven were so great that they demand a reversal. Though it is possible for a number of errors to cumulatively rise to the point where they become harmful,[34] we have never found that "non-errors

---

[34] *See Stahl v. State,* 749 S.W.2d 826, 832 (Tex. Crim. App. 1988).

may in their cumulative effect cause error."[35]  Point of error eight is overruled.

### C.  Multiple Challenges to the Death Penalty Scheme

In points of error ten through seventeen, appellant raises challenges to the Texas death penalty scheme that we have already rejected.  In point of error ten, appellant contends that the trial court violated the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by failing to instruct the jury that a vote by one juror would result in a life sentence despite the statuory requirement of ten votes for a "No" answer to the question of future dangerousness, or for a "Yes" vote to a finding of mitigating circumstances.  In point of error eleven, appellant argues that the court violated the Eighth Amendment by failing to instruct the jury that there is no presumption in favor of death, even if they were to find appellant to be a "future danger" in answer to special issue number one, and that special issue number three, regarding mitigating circumstances, is to be taken up and considered independently, without regard to the jury's finding on issue one.  In points of error twelve through fifteen, appellant argues that the jury should have been instructed on the definitions of particular words and phrases in the jury charge and, in not doing so, the trial court violated the United States Constitution.  In point of error sixteen, appellant argues that the trial court erred when it denied his motion to preclude the death penalty as a sentencing option due to equal protection violations.  In point of error seventeen, appellant alleges that the trial court erred when it refused to hold Article 37.071 unconstitutional because a grand jury had not considered, and alleged in an indictment, the facts legally essential to appellant's conviction and death sentence.

---

[35]  *Chamberlain v. State*, 998 S.W.2d, 230, 238 (Tex. Crim. App. 1999).

All of these claims have been rejected in the past.[36] It is sufficient to dispose of such claims "by recognizing that the trial court submitted a charge consistent with applicable state statutes, which have withstood numerous constitutional challenges."[37] Points of error ten through seventeen are overruled.

### D. Lethal injection cruel and unusual

In point of error eighteen appellant argues that the procedure used by the State of Texas in which lethal injections are employed in administering the death penalty violates the right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution. Since appellant's execution is not imminent his argument is not ripe for review.[38] Point of error eighteen is overruled.

We affirm the judgement of the trial court.

DELIVERED: April 8, 2009
PUBLISH

---

[36] *Saldano v. State*, 232 S.W.3d 77, 104-09 (Tex. Crim. App. 2007), *cert. denied*, 128 S. Ct. 1446 (2008); *Threadgill v. State,* 146 S.W.3d 654, 672 (Tex. Crim. App. 2004); *Blue v. State*, 125 S.W.3d 491, 504-05 (Tex. Crim. App. 2003); *Martinez v. State*, 924 S.W.2d 693, 698 (Tex. Crim. App. 1996); *see also Gallo v. State,* 239 S.W.3d 757, 779-780 (Tex. Crim. App. 2007); *Perry v. State,* 158 S.W.3d 438 (Tex. Crim. App. 2004); *Woods v. State*, 152 S.W.3d 105, 121 (Tex. Crim. App. 2004).

[37] *Saldano*, 232 S.W.3d at 107.

[38] *Segundo v. State*, 270 S.W.3d 79, 104 (Tex. Crim. App. 2008).