**Opinion issued July 30, 2009**



**In The**

*Court of Appeals*

**For The**

*First District of Texas*

————

**NO. 01-08-00275-CR**

————

**WILLIAM MARK GIBSON, Appellant**

**v.**

**THE STATE OF TEXAS, Appellee**

**On Appeal  from the 54th District Court**
**McLennan County, Texas**
**Trial Court Cause No. 2006-1329-C2**

## PRESUBMISSION MEMORANDUM

A jury convicted appellant, William Mark Gibson, of capital murder. *See* TEX. PEN. CODE ANN. § 19.03 (Vernon Supp. 2008). Because the State did not seek the death penalty, a life sentence in prison was automatic. *Id.* at § 12.31(a) (Vernon Supp. 2008). In three issues, appellant contends that: (1) the trial court violated his constitutional right to a unanimous verdict by charging the jury in the disjunctive when two different theories of capital murder were alleged; (2) Section 19.03 of the Texas Penal Code ("the capital murder statute"), if it permits such a disjunctive charge, violates the Texas Constitution's guarantee of a unanimous verdict; and (3) the trial court erred by overruling appellant's objections to the introduction of evidence regarding threats appellant allegedly made to his alibi witnesses. We affirm.

## Background

A fire at the house in which they were renting a room killed appellant's ex-wife, Janie Rios, and her daughter, Abby, in the early morning hours of November 13, 1999. Authorities determined that the fire was intentionally set.

In October of 2006, appellant was indicted for capital murder in connection with the deaths. In three paragraphs, the indictment alleged that appellant murdered Janie in the course of committing arson; murdered both Janie and Abby during the same criminal transaction; and murdered Abby, who was under six years old. The

2

State did not seek the death penalty.

After a first trial resulted in a hung jury, the case went to trial for the second time in February 2008. The State abandoned the third paragraph of the indictment, which dealt with the murder of a child under six.

Appellant presented his mother, Martha Gibson ("Gibson"), and former live-in girlfriend, Martha Loredo ("Loredo"), as alibi witnesses. Both testified that, on the night of the fire, Loredo and appellant were living with Gibson. Gibson testified that she went to bed first and that Loredo and appellant were in bed when she opened their bedroom door at 6:30 a.m. to inform them of the fire, about which she had learned from a relative. Loredo testified that appellant was in bed with her "all night" until Gibson woke them up. The State impeached both witnesses with statements they had made to police in the past. In those statements, the witnesses detailed threats appellant had made to them, including threats to kill them and to burn Gibson's house down. In response to appellant's objections on several grounds, the State argued that the statements were probative of bias or motive because they showed that appellant's alibi witnesses feared him.

The court charged the jury disjunctively on the two theories of capital murder. The jury convicted appellant.

**Unanimity**

3

In his first issue, appellant contends that the trial court violated his constitutional right to a unanimous verdict by disjunctively submitting two different theories of capital murder to the jury. Appellant specifically argues that each theory listed in the capital murder statute constitutes a separate offense, rendering such a disjunctive charge improper.

**The Capital Murder Statute**

The capital murder statute provides that a person commits the offense of capital murder if the person intentionally or knowingly causes the death of an individual and one of the following aggravating circumstances exists:

(1) the person murders a peace officer or fireman who is acting in the lawful discharge of an official duty and who the person knows is a peace officer or fireman;

(2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat under Section 22.07(a)(1), (3), (4), (5), or (6) [of the Penal Code];

(3) the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration;

(4) the person commits the murder while escaping or attempting to escape from a penal institution;

(5) the person, while incarcerated in a penal institution, murders another:
    (A) who is employed in the operation of the penal institution; or
    (B) with the intent to establish, maintain, or participate in a combination or in the profits of a combination;

4

(6) the person:
    (A) while incarcerated for an offense under this section or Section 9.02 [of the Penal Code], murders another; or
    (B) while serving a sentence of life imprisonment or a term of 99 years for an offense under Section 20.04, 22.021, or 29.03, murders another;

(7) the person murders more than one person:
    (A) during the same criminal transaction; or
    (B) during different criminal transactions but the murders are committed pursuant to the same scheme or course of conduct;

(8) the person murders an individual under six years of age; or

(9) the person murders another person in retaliation for or on account of the service or status of the other person as a judge . . . .

TEX. PENAL CODE ANN. § 19.03(a) (Vernon Supp. 2008).

**The Indictment and Jury Charge**

Paragraph I of the indictment in this case alleged that appellant "did then and there intentionally cause the death of an individual, namely, JANIE RIOS, by starting a fire that cause [sic] the death of JANIE RIOS, and the defendant was then and there in the course of committing or attempting to commit the offense of arson of a building of Henry Thomas Norris, who was the owner of said building." Paragraph II alleged that appellant "did then and there intentionally or knowingly cause the death of an individual, namely JANIE RIOS, by starting a fire that cause [sic] the death of JANIE RIOS, and did then and there intentionally or knowingly cause the death of another individual, namely, ABBY RIOS, by starting a fire that caused the death of ABBY RIOS, and both murders were committed during the same criminal transaction."

5

Hence, the first paragraph of the indictment alleged the presence of an aggravating factor described in subsection (a)(2) of the capital murder statute, while the second paragraph alleged the presence of an aggravating factor described in subsection (a)(7)(A).

The jury charge read, in relevant part, as follows (emphasis in italics added):

Now, if you find from the evidence beyond a reasonable doubt that on or about the 13th day of November, 1999, in McLennan County, Texas, the defendant, William Mark Gibson, *did then and there intentionally cause the death of an individual, namely, Janie Rios, by starting a fire that caused the death of Janie Rios, and the defendant was then and there in the course of committing or attempting to commit the offense of arson of a building of Henry Thomas Norris, who was the owner of said building; or* if you find from the evidence beyond a reasonable doubt that on or about the 13th day of November, 1999, in McLennan County, Texas, the defendant, William Mark Gibson, *did then and there intentionally cause the death of an individual, namely, Janie Rios, by starting a fire that caused the death of Janie Rios, and did then and there intentionally cause the death of another individual, namely, Abby Rios, by starting a fire that caused the death of Abby Rios, and both murders were committed during the same criminal transaction*, then you will find the defendant guilty of Capital Murder, as alleged in the indictment.

**The Case Law**

Appellant argues that the disjunctive language of the charge violated his right to a unanimous jury verdict. The Court of Criminal Appeals recently decided an identical issue adversely to appellant. In *Gamboa v. State*, No. AP-75635, 2009 WL 928552 (Tex. Crim. App. Apr. 8, 2009), the defendant was charged in a two-paragraph indictment with committing a murder while committing or attempting to commit the

offense of robbery and with committing two murders during the same criminal transaction. The two theories were submitted to the jury disjunctively, and the defendant made the same complaint on appeal that appellant does here.

The Court of Criminal Appeals affirmed the trial court.[1] In doing so, the Court cited its prior holding in *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991), that the disjunctive submission of two theories of capital murder with two different aggravating elements "did not violate the right to a unanimous verdict because the different theories were simply alternate methods of committing the same offense." *Gamboa*, 2009 WL 928552, at *6.

The defendant in *Gamboa* argued that *Kitchens* was distinguishable because the alternate theories of capital murder in *Kitchens* involved aggravating elements that were both listed within one subsection (subsection (a)(2)) of the capital murder statute, while his case, like the one now before us, implicated two separate subsections (subsections (a)(2) and (a)(7)(A)). The *Gamboa* court reexamined the relevant precedent and found that distinction immaterial, concluding that the *Kitchens* holding "applies equally to all alternate theories of capital murder contained within [the capital murder statute], whether they are found in the same or different subsections, so long

---

[1]    Because *Gamboa* was a death penalty case, appeal to the Court of Criminal Appeals was automatic.

as the same victim is alleged for the predicate murder[.]" *Id.* at *7.

In the instant case, the State alleged the same victim, Janie Rios, for the predicate murder under both charged theories of capital murder. Because *Gamboa* and *Kitchens* therefore control, we overrule appellant's first issue.

**Constitutional Challenge**

In his second issue, appellant contends that the capital murder statute, if it permits a disjunctive charge, violates the Texas Constitution's guarantee of a unanimous verdict.

The Texas Constitution requires jury unanimity in felony cases. TEX. CONST. art. V, § 13; *Pizzo v. State*, 235 S.W.3d 711, 714 (Tex. Crim. App. 2007). "Unanimity ensures that all jurors reach a consensus 'on the same act for a conviction.'" *Pizzo*, 235 S.W.3d at 714 (quoting *Francis v. State*, 36 S.W.3d 121, 125 (Tex. Crim. App. 2000)). Jury unanimity is required on the essential elements of the offense but is generally not required on the alternate modes or means of commission. *Pizzo*, 235 S.W.3d at 714.

Appellant argues that the subsections of the capital murder statute establish not one crime but several, each independent from the others. As a result, he argues, every subsection represents an essential element of a particular type of capital murder and requires a unanimous finding. To comply with the demands of the Texas Constitution,

8

appellant contends, the legislature "should redraft the statute to make it plain that [the subsections] are elements and not 'manner or means,' and that the jury must find them unanimously." Appellant offers no support for this argument other than his own statement that the subsections of the capital murder statute "are forbidden conduct" and consequently fall within the definition of "element" provided in Section 1.07(a)(22)(A) of the Penal Code.[2]

We find no precedent bolstering appellant's claim that the subsections of the capital murder statute establish essential elements of independent offenses even when only one predicate murder is alleged. Rather, the Court of Criminal Appeals has repeatedly held that, in such a case, the subsections establish alternative theories of committing one crime. *See Gamboa*, 2009 WL 928552, at *7; *Kitchens*, 823 S.W.2d at 257–58; *Martinez v. State*, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004). Moreover, the court specifically applied the term "modes of commission" to the discussion in *Pizzo* of its *Kitchens* holding, which we find instructive because *Kitchens* was a capital murder case. *Pizzo*, 235 S.W.3d at 716 ("We concluded [in *Kitchens*] that a jury may issue a general verdict where different *modes of commission* are submitted in the disjunctive and there is sufficient evidence to support either *mode*

---

[2] The Penal Code defines "element of offense" as the forbidden conduct, the required culpability, any required result, and the negation of any exception to the offense. TEX. PENAL CODE ANN. § 1.07(a)(22) (Vernon Supp. 2008).

9

*of commission.*" [emphasis added]). As noted above, the court stated in *Pizzo* that the Texas Constitution generally does not require jury unanimity on the alternate modes or means of commission of an offense. *Id.* at 714.

The capital murder statute requires unanimous findings that a defendant committed a murder and that at least one of several listed aggravating circumstances was present. Appellant has not persuaded us that those requirements fall short of the mandates of the Texas Constitution. We overrule appellant's second issue.

### Threats to Witnesses

In his third issue, appellant contends that the trial court erred by overruling appellant's objections to the introduction of evidence regarding threats appellant allegedly made to his alibi witnesses.

*Alibi Testimony*

Appellant called Loredo and Gibson as alibi witnesses. At the time of the fire, both appellant and Loredo were living with Gibson, and both Loredo and Gibson testified that all three were home that night. Gibson testified that she went to bed first and that appellant and Loredo were in bed at 6:30 a.m. when Gibson opened their bedroom door to inform them of the fire. Loredo testified that appellant was in bed with her "all night" until Gibson woke them up.

*Impeachment of Gibson*

10

On cross-examination, the prosecutor asked Gibson:

[Prosecutor]: Have you ever been afraid of your son?

[Gibson]: No.

[Prosecutor]: Do you want to think carefully before you answer that question?

[Gibson]: I'm not afraid of my son.

At this point, the parties conferred with the court in chambers.[3] The chambers conference proceeded as follows:

> [Prosecutor]: Your Honor, I have a written statement by Martha Flores Gibson from July 31st of 2000, regarding threats made to her by her son, [appellant]. She called the police department and stated that she was terrified because he had told her he was going to send somebody over there to—and pardon my language, this is a quote, f\*\*\* us, rape us and slice our throats, unquote. He called four or five times making threats, that he had threatened to kill his sister, that he had made threats against Martha Loredo. And additionally, I have an audio statement of Pat Swanton and Tim Lawdermilk speaking with her in 2006, in which she reiterated that those statements and threats were made and that he had threatened to burn the house down around her and the children.

> [The Court]: All right.

> [Defense counsel]: Your Honor, we—our response to that would be that the Government is trying to bootstrap these statements in. There's no evidence that they're tied in any way to this witness' [sic] perspective testimony with relation to this or any other offense. And they're terribly inflammatory and prejudicial against us, and that the Government is trying to bootstrap their admission, although they are not probative to the issues in this particular case.

---

[3] The court had granted appellant's motion in limine with regard to, among other things, "threats to cause harm directly or through third parties."

[Prosecutor]: Your Honor, I think it affects the witness' [sic] biases. On the one hand, she's emotionally obviously tied to her son. On the other hand, I think she's frightened of what he might do if she doesn't do what she's expected to do. And I think it—it goes to the credibility of her testimony.

[Prosecutor's co-counsel]: We think it goes to the motive, bias and prejudice of the witness testifying. The statement that we wish to offer is that he threatened to burn her house down, uh, that—

[The Court]: As far as that goes, I'll allow that statement.

[Prosecutor's co-counsel]: All right. That's the only one—that's the only one we intend to issue. We think it goes to her credibility as a witness. This is a direct threat made by the defendant to this witness that could influence her testimony and how she testifies. We would like to ask her about that. She can confirm or deny that she made it. If she denies it, then we believe we, under the law, have the right to offer extrinsic evidence of that. We have a recording which the officer made which we're prepared to offer at a later time.

Back in open court, Gibson testified as follows on cross-examination:

[Prosecutor]: Ms. Gibson, do you remember making a phone call to the Waco Police Department on June 27th of 2006?

[Gibson]: No, ma'am, I don't remember.

[Prosecutor]: Do you remember that you reported at that time to the Waco Police Department that you were afraid of your son because he had threatened to burn your house down?

[Defense counsel]: Your Honor, I'm going to object to this testimony on the grounds we stated earlier.

[The Court]: Overruled.

[Defense counsel's co-counsel]: And, Judge, also, she doesn't remember.

[The Court]: You can ask the question, if she says yes or no—

12

[Prosecutor]: I'm just trying to establish the predicate, Your Honor.
[To Gibson]: Are you saying that you don't remember?

[Gibson]: I don't remember.

[Prosecutor]: You don't remember a time that you reported it to the police or you don't remember your son's telling you he was going to burn your house down?

[Gibson]: I don't remember reporting it to the police, ma'am.

[Prosecutor]: Okay. Are you clearly saying that your son never told you that he was going to burn your house down in June of 2000—I'm sorry, in—yeah, June of 2006?

[Gibson]: I don't remember, ma'am.

[Prosecutor]: Okay. But you steadfastly commit to this jury that you're not worried about what your son might do if you don't testify the way he expects you to in this trial?

[Gibson]: My son doesn't have nothing to do with me testifying here. I mean, I'm—I'm here, you know—I was asked to come here, you know, for my son's sake, yes. You know, this is my son. But my son is not a threat to me at all because he will not hurt me at all. My son has never told me anything like that.

On rebuttal, the State called Sergeant Swanton of the Waco Police Department:

[Prosecutor]: Now, let me direct your attention to June the 27th of the year 2006. And did you have an occasion on that date to go and conduct an interview with Martha Gibson concerning a matter of—with—involving her son, [appellant]?

[Swanton]: Yes, sir, I did.

[Prosecutor]: Okay. And did you have an occasion to ask her about a threat that her son, [appellant], had made concerning burning their house down?

13

[Swanton]: Yes, sir, I did.

[Prosecutor]: And did she tell you that [appellant] had made that threat?

[Swanton]: She did.

[Prosecutor]: Okay. Did you make a recording of that conversation?

[Swanton]: Yes, sir.

The State then offered the portion of the recording in which Gibson described appellant's threat to burn her house down. The portion was admitted into evidence and played for the jury.

*Impeachment of Loredo*

On cross-examination, the prosecutor asked Loredo the same question she had asked Gibson:

[Prosecutor]: Have you ever been afraid of [appellant]?

[Loredo]: No.

The parties again conferred with the court in chambers:

[Prosecutor]: Your Honor, I have a written statement from Martha Loredo dated July 31st of 2000, approximately eight and a half months after—after the fatal fire. I won't read all of it. But essentially it says, "Well, [appellant] had told me that he was mad at me for calling CPS on him. I told him that no one in this house called CPS on him and that he would have to stop calling the house. As he would not stop calling the house saying that he was going to kill all of us [sic]. And that he was going to get me back for leaving him. And he told his mom that she was a bitch for letting me stay here at the house." And the rest isn't really relevant. Let me see.
        Yeah. So essentially, that he was calling and saying that he was going to

14

kill her and all of the people in the house.

Defense counsel voiced objections similar to those made to Gibson's statements, and the prosecutors gave similar responses. The trial court ruled that the prosecutor could ask Loredo about the statement. Loredo then testified as follows:

[Prosecutor]: Ms. Loredo, do you remember making a police report on July 31st of 2000?

[Loredo]: July 31st, 2000. No, I don't remember making one.

[Prosecutor]: Do you remember making a written statement to a police officer regarding the defendant's threats to kill you and everyone in the house?

[Loredo]: What year was that?

[Prosecutor]: 2000. It was about eight months after the fatal fire.

[Loredo]: 2000.

[Prosecutor]: It was while you were living with [Gibson] and [appellant] was not?

[Loredo]: No.

[Prosecutor]: You don't remember it?

[Loredo]: No.

[Prosecutor]: Permission to approach, Your Honor?

[The Court]: All right.

[Prosecutor]: Ma'am, would you please read this statement to yourself, not aloud—

15

[Loredo]: Okay.

[Prosecutor]: —to the top where I've marked in ink here.

[Loredo]: (Reading.)
    Yes, ma'am. This is, um—yeah, I remember.

[Prosecutor]: You do remember making this statement?

[Loredo]: Now that I finished, yes.

[Prosecutor]: All right. And it's in your own handwriting, is it not?

[Loredo]: Yes, ma'am.

[Prosecutor]: And having refreshed your memory with that statement, would you like to answer again whether or not you were afraid of the defendant on July 31st of 2000?

[Loredo]: Um, not afraid of him. Um, more just concerned.

[Prosecutor]: What exactly had he threatened to do?

[Loredo]: That—that day, uh, he was very, very drunk. And, um, he was going to call CPS on the kids and take my baby away and, um, stuff like that. But it's just—we were just arguing.

[Prosecutor]: Wasn't it actually that he was mad at you because he thought you had called CPS on him?

[Loredo]: That he—I don't remember that day.

[Prosecutor]: Would you like to look at it again?

[Loredo]: He was upset because he thought I called CPS on him, but I didn't. And that's when we got into that argument.

[Prosecutor]: And what did he threaten to do to you?

16

[Loredo]: Um, he said a lot of things that day. I don't actually remember.

[Prosecutor]: Well, you've just refreshed your memory. What did you tell the police officers that he threatened to do to you?

[Loredo]: I lied. I lied to the police officers. Yes, I did.

[Prosecutor]: You're stating now under oath that you lied to the police officers in this written statement?

[Loredo]: Yes. I was upset and I lied to the police officers.

[Prosecutor]: So when you said—
[To the Court]: May I read this, Your Honor?

[The Court]: Uh-huh.

[Prosecutor, reading statement]: "Well, [appellant] had told me that he was mad at me for calling CPS on him. I told him that no one in this house called CPS on him and that he would have to stop calling the house, if he would not stop calling the house saying that he was going to kill all of us and that he was going to get back at me for leaving him [sic]." Is that what you wrote?

[Loredo]: Yes.

[Prosecutor]: Okay. And is the fact that he has threatened you in the past, um, does that have any impact on your willingness to testify for him now and give him an alibi so that he won't be mad at you?

[Loredo]: No, ma'am. I'm not afraid of [appellant].

[Prosecutor]: And do you admit that you were afraid of him on July 31st of 2000?

[Loredo]: We were angry. People say things when they're angry.

## Arguments

17

Appellant poses several arguments, some of which overlap, as to why the trial court erred in admitting the threats made to Gibson and Loredo. First, appellant argues that "the question 'Have you ever been afraid of [Appellant]?' is not relevant" because it did not establish whether the alibi witnesses were afraid of appellant at the time they testified. Second, appellant argues that the admitted statements were not "prior inconsistent statements." Third, appellant argues that the events discussed in the prior statements "occurred in the past" and therefore were irrelevant to the question of bias at the time of trial. Fourth, appellant argues that the prosecutors simply impeached the witnesses with highly prejudicial evidence and "never asked a question" to determine whether the witnesses "were making up the alibi story." Lastly, appellant argues that the prosecutors inquired about the witnesses' fear of appellant "in bad faith so that the extraneous threats could be put before the jury."

The State argues, as it did at trial, that admission of the objected-to evidence was proper because "the fact that the witnesses had been previously threatened with grievous bodily harm or death was relevant to establish bias or interest in that they were afraid not to testify favorably for appellant."

**Applicable Law**

The admissibility of evidence is within the discretion of the trial court and will not be overturned absent an abuse of discretion. *Moses v. State*, 105 S.W.3d 622, 627

18

(Tex. Crim. App. 2003). "That is to say, as long as the trial court's ruling was within the zone of reasonable disagreement, the appellate court should affirm." *Id.*

After laying the proper predicate, an adverse party may impeach a witness "by proof of circumstances or statements showing bias or interest on the part of such witness," unless the witness unequivocally admits such bias or interest, in which case "extrinsic evidence of same shall not be admitted." TEX. R. EVID. 613(b). An adverse party has the right to prove any motive or declaration of a witness which will tend to show his bias, interest or prejudice, or any other mental condition of the witness which in any manner tends to affect his credibility. *Carter v. State*, 668 S.W.2d 851, 853 (Tex. App.—San Antonio 1984, pet. ref'd) (citing *Jackson v. State*, 482 S.W.2d 864, 867 (Tex. Crim. App. 1972)). Evidence to show bias or interest "encompasses all facts and circumstances which, when tested by human experience, tend to show that a witness may shade his testimony for the purpose of helping to establish one side of the cause only." *Koehler v. State*, 679 S.W.2d 6, 9 (Tex. Crim. App. 1984) (citing *Jackson*, 482 S.W.2d at 868). The trial court has considerable discretion as to how bias is proven and as to what collateral evidence can be introduced for that purpose. *Spriggs v. State*, 652 S.W.2d 405, 408 (Tex. Crim. App. 1983); *Kelley v. State*, 807 S.W.2d 810, 817 (Tex. App.—Houston [14th Dist.] 1991, pet. ref'd). An inquiry into whether a defense witness has "ever been afraid of" a criminal defendant fairly

19

inquires into a condition which might affect the credibility of the witness. *Carter*, 668 S.W.2d at 853.

**Rulings**

We conclude that the trial court did not abuse its discretion by allowing the prosecutors to impeach the witnesses with their prior statements. Given the closeness of the relationships between the alibi witnesses and appellant and the nature of the alleged threats, the trial court's rulings that the statements made by the witnesses to police were probative of bias, motive, or interest because fear of appellant may have affected their testimony did not fall outside of the zone of reasonable disagreement.

Appellant argues that the State impeached his witnesses "in bad faith so that the extraneous threats could be put before the jury," citing *Brown v. State*, 523 S.W.2d 238, 241–42 (Tex. Crim. App. 1975). *Brown* is distinguishable because it deals with the question of when a party may impeach its own witness, not the question of how a party may impeach an adverse witness. Regardless, the record here shows that the statements were introduced for a clearly defined purpose following fair inquiries into the credibility of the witnesses.

Appellant further argues that the witnesses' statements were not "prior inconsistent statements" and were too temporally remote to be probative of bias. Impeachment through bias, motive, or interest and impeachment by prior inconsistent

20

statement are two distinct types of impeachment. *Michael v. State*, 235 S.W.3d 723, 725–26 (Tex. Crim. App. 2007); TEX. R. EVID. 613(a)–(b). Impeachment through bias is a general attack on the witness, while impeachment by prior inconsistent statement is an attack on the accuracy of specific testimony. *Michael*, 235 S.W.3d at 725–26. As to the timing issue, the trial court could reasonably have concluded that the statements were not so remote as to make them irrelevant to show possible witness bias. Evidence to show bias or interest "encompasses *all facts and circumstances* which, when tested by human experience, tend to show that a witness may shade his testimony for the purpose of helping to establish one side of the cause only." *Koehler*, 679 S.W.2d at 9 (emphasis added).

Finding no abuse of discretion, we overrule appellant's third point of error.

### Conclusion

We affirm the judgment of the trial court.


George C. Hanks
Justice


Panel consists of Justices Keyes, Hanks, and Bland.

Do not publish. *See* TEX. R. APP. P. 47.2(b).