

# NUMBER 13-12-00514-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ALEX ESTUARDO RAMIREZ DIAZ A/K/A
ALEX ESTUARDO RAMIREZ A/K/A JUAN
CARLOS REYES-ALVARADO A/K/A
JUAN RAMIREZ A/K/A JUAN,                                    Appellant,

v.

THE STATE OF TEXAS,                                        Appellee.

**On appeal from the 105th District Court
of Kleberg County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Memorandum Opinion by Justice Rodriguez**

Appellant Alex Estuardo Ramirez Diaz a/k/a Alex Estuardo Ramirez a/k/a Juan

Carlos Reyes-Alvarado a/k/a Juan Ramirez a/k/a Juan challenges his conviction by a jury

for murder.  *See* TEX. PENAL CODE ANN. § 19.03(b) (West 2011).  By four issues, which

we consolidate and re-number as one, appellant argues that the trial court erred in permitting two witnesses to identify him during trial where their pre-trial identifications were based on photo line-ups that were impermissibly suggestive.   We affirm.

## I.  Background[1]

In September 1996, appellant was indicted on two counts of murder in connection with the shooting death of Jose Luis Uribe.  *See id.*   Appellant was not arrested until 2011.   He pleaded not guilty, and his case was tried to a jury.

At trial, there was testimony that on August 15, 1996, a man whom Uribe knew as "Juan Ramirez" came by the house Uribe shared with his wife and his wife's son and niece.   "Juan" was driving a white car.   Uribe and the man had an argument, the man left, and later returned to the home and shot Uribe with a .22-caliber rifle.   Uribe died almost immediately.

The primary issue at trial was the identification of the man who shot Uribe. Alejandro Hernandez, a friend of Uribe, testified that he was at Uribe's home on the day of the shooting.   He testified that he had known "Juan" for "about a year" before the shooting, that he had seen him "maybe about five times."   Hernandez testified that on the day of the shooting, "Juan" came to Uribe's house around 4 p.m., and "Juan" and Uribe had an argument in the front yard.   Hernandez broke up the fight, and "Juan" left angrily, saying that he was going to come back and kill Uribe.   Hernandez testified that "Juan" returned, in a white car, shortly after making the threat and began shooting.   Hernandez testified that he, Uribe, Uribe's wife, and Uribe's wife's daughter were in the front yard at

---

[1] Because this is a memorandum opinion and the parties are familiar with the facts, we will not recite them here except as necessary to advise the parties of the Court's decision and the basic reasons for it.   *See* TEX. R. APP. P. 47.4.

the time. Hernandez then identified appellant in court as the man he knew at the time as "Juan" and testified that he was the man who shot Uribe.

After this testimony, the State admitted, over defense counsel's objection, the photo line-up Hernandez had been shown the day after the shooting.[2] The line-up included six photographs of Latino men. Five of the photographs had identical backgrounds. The final photograph, which was the photograph of appellant, had a different background. Both on the night of the shooting and in his testimony at trial, Hernandez pointed to appellant's photo in the line-up and stated that was the man who shot Uribe.

After identifying appellant in the photo line-up, Hernandez provided further details surrounding the shooting. He testified that the weapon appellant used was a "large" gun that "looked like a rifle, like a shotgun type." He also testified that appellant shot at the front yard from the street, that "[appellant] remained by the car."

Uribe's wife, Odelia, identified appellant as the man she knew at the time as "Juan" and testified that he was the shooter. Odelia testified that she had poor eyesight. She was seventy-eight years old at the time of trial and in her early sixties at the time of the shooting. Gloria Longoria, Odelia's niece, testified that she witnessed the shooting; that "Juan" was the shooter; and that appellant was the man she once knew as "Juan." Longoria testified that she knew appellant before the shooting, specifically, that she had previously danced with him at a night club.

Rudy Saenz, Uribe's wife's son, testified that he also knew "Juan Ramirez." He testified that he "part[ied]" with "Juan" on "a few occasions" and that if they "got too

---

[2] State's Exhibit 2, which contains the photo line-up shown to Hernandez, indicates that Hernandez was shown the line-up on August 16, 1996 at 3:45 a.m., less than twelve hours after the shooting.

3

drunk," he and "Juan" "had some sex." He identified appellant in court as the man he knew at the time as "Juan." Saenz was in his room inside Uribe's home at the time of the shooting. He testified that he did not see the shooting and did not hear anything.

Saenz then testified that on the morning after the shooting,[3] he was shown a photo line-up by a deputy. The line-up was admitted as State's Exhibit 1. It contained the same line-up as the one shown to Hernandez. Both on the night of the shooting and in his testimony at trial, Saenz pointed to appellant's photo in the line-up and stated that was the man whom he knew at the time as "Juan."

Finally, Christina Perez testified that at the time of the shooting, she was dating a man known as "Juan Ramirez." She identified appellant in court as the man she knew at the time as "Juan." On the day of the shooting, she let "Juan" borrow her white car. Prior to the shooting, "Juan" had also asked Perez to buy him a gun; she testified that she bought him a rifle at a pawn shop.

After the close of evidence, the jury returned a guilty verdict. The trial court sentenced appellant to sixty years' incarceration. This appeal followed.

## II. Discussion

By one issue, appellant complains that the trial court erred in denying his motions to suppress Hernandez and Saenz's in-court identifications where their pre-trial identifications were based on impermissibly suggestive photo line-ups.

We review de novo the question of whether a pretrial identification procedure was impermissibly suggestive. *Gamboa v. State*, 296 S.W.3d 574, 581 (Tex. Crim. App. 2009). Reliability is the linchpin in determining the admissibility of an identification.

---

[3] State's Exhibit 1, which contains the photo line-up shown to Saenz, indicates that Saenz was shown the line-up on August 16, 1996 at 4:25 a.m.

4

*Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999). In our review, our first inquiry is whether the pretrial identification procedure was impermissibly suggestive. *Gamboa*, 296 S.W.3d at 581. If we conclude that the procedure was impermissibly suggestive, we then determine if the impermissibly suggestive nature of the pretrial line-up gave rise to a substantial likelihood of irreparable misidentification. *Id.* at 581–82. If the pretrial procedure is found to be impermissibly suggestive, identification testimony would still be admissible where the totality of the circumstances shows no substantial likelihood of misidentification. *See Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008) (citing *Ibarra*, 11 S.W.3d at 195). Appellant must show by clear and convincing evidence that the identification has been irreparably tainted before his conviction can be reversed. *See Barley v. State*, 906 S.W.2d 27, 34 (Tex. Crim. App. 1995).

Assuming without deciding that the pretrial identification procedures used in this case were impermissibly suggestive, appellant has failed to show by clear and convincing evidence that these procedures gave rise to a substantial likelihood of irreparable misidentification. We consider the following factors when determining the likelihood of irreparable misidentification: (1) the witness's opportunity to view the perpetrator at the time of the offense; (2) the witness's degree of attention during the offense; (3) the accuracy of the witness's prior description of the perpetrator; (4) the witness's level of certainty regarding his identification at the time of confrontation; and (5) the lapse of time between the offense and the subsequent confrontation. *Gamboa*, 296 S.W.3d at 582; *Luna*, 268 S.W.3d at 605. Ultimately, we will find a witness's in-court identification admissible when it is of an independent origin from any pre-trial identification. *See Zepeda v. State*, 797 S.W.2d 258, 260 (Tex. App.—Corpus Christi 1990, pet. ref'd); *see*

5

*also Jimenez v. State*, No. 13-99-00776-CR, 2002 WL 228794, at *12 (Tex. App.—Corpus Christi Feb. 14, 2002, pet. ref'd) (mem. op., not designated for publication); *Ochoa v. State*, No. 13-00-00033-CR, 2001 WL 997355, at *1–2 (Tex. App.—Corpus Christi Apr. 12, 2001, no pet.) (not designated for publication).

Here, both Hernandez and Saenz provided identifications that were independent of their photo line-up identifications and the facts underlying those independent identifications made it unlikely there would be an irreparable misidentification. Hernandez testified that he had known appellant for close to a year before the shooting. He testified that he had been at Uribe's home when appellant first arrived and had broken up the initial fight between the two men. He was able to give a detailed description of the type of gun that was used and, because he was in the front yard, was very close to the shooter who was by his car at the curb. Finally, less than twelve hours had passed since the shooting when Hernandez identified appellant in the photo line-up. Although Hernandez's testimony does not contain a detailed description of appellant's appearance at the time of the shooting, Hernandez had ample opportunity to view appellant at the time of the offense, was generally familiar with appellant because of his year-long acquaintance with him, was greatly involved in the events leading up to the shooting, and identified appellant as the perpetrator shortly after the shooting. *See Gamboa*, 296 S.W.3d at 582 (listing as relevant factors the witness's opportunity to view the perpetrator and the witness's degree of attention during the offense). These independent bases for Hernandez's identification of appellant make it unlikely that there was a misidentification. *See Zepeda*, 797 S.W.2d at 260.

Saenz's testimony was likewise reliable. *See Ibarra*, 11 S.W.3d at 195. From

6

our review of the record, it is apparent that the State used Saenz to generally identify appellant as the "Juan Ramirez" who was known to socialize in the same circles as Saenz's family and friends. In short, Saenz's testimony was used as a link in the State's chain connecting the man known to everyone at the time as "Juan" to appellant. And in that regard, Saenz's identification of appellant was of an independent origin and did not rely exclusively on the photo line-up. Saenz knew appellant from parties and had had sex with appellant. These independent factors made it unlikely that Saenz misidentified appellant. *See Zepeda*, 797 S.W.2d at 260; *see also Gamboa*, 296 S.W.3d at 581–82.

In sum, we conclude that both Hernandez and Saenz's in-court identifications of appellant were admissible. Their in-court identifications were underpinned by numerous facts that were independent of their photo line-up identifications. *See Zepeda*, 797 S.W.2d at 260. Thus, the totality of the circumstances show that the identifications were reliable. *See Luna*, 268 S.W.3d at 605; *Ibarra*, 11 S.W.3d at 195. The trial court did not err in allowing Hernandez and Saenz to identify appellant in court. Appellant's issue is overruled.

### III. Conclusion

We affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the 19th
day of December, 2013.

7