

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-12-00156-CR

_____

GLENN WADE MYERS, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 115th District Court
Upshur County, Texas
Trial Court No. 16,007

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

After hearing the shotgun blast that hit Cindy Espinosa in the face and killed her, Espinosa's daughter-in-law, Nochelle White, reportedly looked out the window, ostensibly in the direction of the blast, and saw Espinosa's brother, Glenn Wade Myers, Jr., running with a long gun across a clearing between Espinosa's trailer and Myers' trailer. From a jury conviction of murder and a sentence of sixty years' imprisonment, Myers appeals, challenging the sufficiency of the evidence to prove that he was the shooter and arguing that he was harmed by improper questioning by the State.

We affirm the trial court's judgment, because (1) sufficient evidence supports the verdict and (2) the trial court's instruction that the jury disregard the State's improper question and its answer was sufficient to remove any prejudice.

*(1)     Sufficient Evidence Supports the Verdict*

On July 2, 2011, a 9-1-1 operator on duty in Upshur County answered a telephone call from Espinosa's daughter, Dawn Tigue, who sounded hysterical. The operator managed to talk with White, determine that a person had been severely injured, and dispatch an ambulance and police to the Myers family compound in which family members lived in various housing.[1]  On arrival, they found Espinosa dead on a sidewalk near the front door of her home from a single, close-range shotgun blast to the head.

Tigue testified that she was living in Espinosa's trailer and was reading a book when she heard a "boom" and went outside to find her mother lying injured on the ground in front of their

---

[1]Myers lived in a travel trailer, White and her immediate family in a house, and Espinosa and her daughter, Tigue, in another trailer.

trailer. She called 9-1-1 and ran to White's nearby house. White was there and talked to the 9-1-1 operator. White testified that, after the gunshot, she saw Myers crossing the space between Espinosa's and Myers' trailers with a gun. She estimated the distance between the trailers at about forty yards and said she had a clear line of sight. White also testified that Tigue told her Myers had killed Espinosa, but Tigue testified that she had not told her that.

Evidence shows that police responded and called to Myers from outside his house and that Myers came out peacefully and was arrested. Officers did not immediately find any firearm and did not swab Myers' person for gunshot residue. The officers secured the area and began investigating. Officers found six live .410 shotgun shells and one fired shell that were well hidden in the branches of a recently fallen tree next to the end of Myers' trailer. After two days of fruitless searching for the weapon, officers discontinued the high intensity search and began an intermittent search. Four days later, they found an uncorroded .410 gauge shotgun beneath a pickup bed toolbox sitting on the ground beside Myers' trailer. One live shell was in the gun's chamber to go with the six other live shells and one spent shell found earlier. When questioned, Investigator David Cruce testified that, in light of recent storms, had the gun been outside under the box for any length of time, he would have expected the gun to have some sort of corrosion, but there was none. According to Cruce, no gunshot residue swabs were taken from Myers because the kind of kits that local law enforcement had were not being accepted for analysis by the State laboratories. Cruce also testified that the shotgun was checked for fingerprints but that none were found.

3

In addition to catastrophic injury to the victim's face, on autopsy the examiner removed shotgun wadding from Espinosa's mouth and bullet fragments from her neck. Although the bullet (in this case a slug) from a shotgun cannot be matched to a particular barrel, the shell casing can. A State's expert, Stacey Phettepace, testified that her comparison of the empty casing found at the location with a test-fired shell provided sufficient common markings to allow her to determine that the shell was one which had been fired from this shotgun. She also noted that, due to a malfunction, the breakover shotgun would not eject the fired shell—it had to be pried out of the chamber. The forensic examiner who conducted the autopsy testified that Espinosa had gunpowder stippling on her face, thus demonstrating that she was shot at a range of approximately two or three feet. He also found "two shotgun wads"[2] in her mouth that "were consistent with a .410."

Finally, the forensic examiner testified that he found a very small—approximately two millimeters in size—droplet of human blood in a single location on the back lower left portion of Myers' shirt and found none on the shotgun. Trisha Kacer, another forensic scientist, testified thereafter that she had conducted a DNA test of the blood droplet and found that it matched the DNA profile of the victim, with a 1 in 2.381 quintillion probability that an unrelated Caucasian person could be the source of the blood.

Myers asserts that the evidence is insufficient to support the verdict. In evaluating legal sufficiency, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found, beyond a reasonable doubt, the essential

---

[2]Though the forensic examiner used this phrase, there was no suggestion anywhere else in the record that more than one shot had been fired or hit Espinosa.

4

elements of murder. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hall v. State*, No. 06-12-00091-CR, 2013 WL 441007, at *1 (Tex. App.—Texarkana Feb. 6, 2013, pet. filed); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*. Here, the hypothetically correct jury charge for murder required proof that Myers intentionally or knowingly caused the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011); *see Lay v. State*, 359 S.W.3d 291, 294 (Tex. App.—Texarkana 2012, no pet.).

Myers argues that the evidence is insufficient based largely on the inadequacies of the investigation as carried out by law enforcement. There were indeed a number of weaknesses in the way the investigation was conducted. Had a gunpowder swab of Myers' hands been conducted, the results could have provided strong evidence. By the time the gun was found, the

5

location had been unsecured for two days, thus providing at least a chance that it was hidden by some other person after Myers' arrest. As counsel states, although no one observed the shooting, it is apparent that police focused exclusively and immediately on Myers as the suspect, evidently based on the statements made to police by the daughter-in-law of the victim. There is, however, no evidence of anything that would tend to point to some different perpetrator. As also pointed out by counsel, there are a number of inconsistencies between the stories of the various witnesses, but there is no indication that any of those inconsistencies require a different result.

In examining the evidence to support the verdict, we find testimony by White that, immediately after the shooting, she saw Myers running between trailers carrying a long gun, testimony that Myers had an unspecified gun that he used to shoot at coyotes on the property, evidence that a shotgun identified as the murder weapon was found concealed within the Myers compound, and evidence that a droplet of blood identified as being from the victim was found on Myers' (long-unwashed) shirt. The only other people reported to have been in the compound at the time of the shooting were the victim's sister and daughter-in-law, and there is no evidence of any other intrusions into the area. The fatally injured Espinosa was found within seconds of the shooting, although the shooting itself was not seen. Myers denied responsibility and claimed the gun was not his.

The evidence is in conflict. While there is some evidence that, if believed by a jury, could result in an acquittal, there is also evidence that would support a conclusion that Myers was the shooter in this case. Based on the latter evidence and the inferences that could

reasonably be raised therefrom, we conclude that a rational jury could reasonably find the essential elements of murder beyond a reasonable doubt. This contention of error is overruled.

*(2)* *The Trial Court's Instruction that the Jury Disregard the State's Improper Question and Its Answer Was Sufficient To Remove any Prejudice*

Myers contends that reversible error exists because of questions propounded by the State that improperly[3] asked police officers about Myers' post-arrest silence. The State argued at trial that the question and answer were proper for reasons that have no facial validity. The court correctly found the objection valid, sustained the objection, and instructed the jury to disregard. The complained-of exchange played out as follows:

> Q.[State's Attorney]: Have you had the occasion in your experience where those that have committed a crime have been cooperative, spoken to you, confessed to their crimes, and actually showed you where the evidence was?
>
> A.[Witness McCauley]: Yes, sir.
>
> Q. That's not this case, is it?
>
> A. No, sir.
>
> Q. This defendant, he chose not to --
>
> [Defense Counsel]: Your Honor, we need to approach the bench.

---

[3]Although Myers' brief does not carefully differentiate state from federal claims, it does focus our attention on both as a claimed basis for reversal. The actual objection raised at trial is nonspecific as to the federal or state nature of the claim, although it arguably focuses mainly on the federal constitutional right rather than the State variant or its statutory cousin.

A defendant's privilege against self-incrimination and his or her due process rights under the United States Constitution are violated if the State is allowed to impeach the defendant's testimony by using his or her post-arrest, post-*Miranda* silence. *Doyle v. Ohio*, 426 U.S. 610 (1976). The Texas Constitution is more expansive in its protections—when a defendant is arrested, he or she has the right to remain silent and the right not to have that silence used against him or her, even for impeachment purposes, regardless of when he or she is later advised of those rights. TEX. CONST. art. I, § 10; *Sanchez v. State*, 707 S.W.2d 575, 580 (Tex. Crim. App. 1986) (plurality opinion); *Lum v. State*, 903 S.W.2d 365, 369 (Tex. App.—Texarkana 1995, pet. ref'd). That expansion, however, is not at issue here, as this case involves only a comment about Myers' post-arrest, post-*Miranda*-warning silence.

7

(Bench conference)

[Defense Counsel]: I'm not making an objection because this man invoked his right to remain silent, he just inferred that he did not do that and it's improper.

[State's Attorney]: No, it's not.

[Defense Counsel]: Yes, it is and that is objectionable, Your Honor.

[State's Attorney]: I'm talking about in his experience of those that have cooperated and I'm not going to comment on his right –

[Defense Counsel]: This is not the case where the defendant confessed and that's improper.

[State's Attorney]: No, I didn't, I didn't ask that.

[Defense Counsel]: He did.

[State's Attorney]: That is a proper question that in his experience sometimes people will cooperate and other times they don't. He's the one that is to say that this crime scene was contaminated and that those that commit crimes like this destroy and hide evidence.

THE COURT: Part of the question -- part of the question --

[State's Attorney]: That's what this question, this case is about.

THE COURT: Part of the question was okay; part of it wasn't. I'll just instruct the jury. You can rephrase.

[State's Attorney]: I'll rephrase it.

THE COURT: But with regard to your statement, but I'm going to instruct them to disregard that.

[Defense Counsel]: Make a motion for mistrial.

THE COURT: Overruled.

(End of bench conference)

8

THE COURT: Members of the Jury, you'll be instructed to disregard the last question and answer regarding this defendant's lack of cooperation or statement to this or in this case.

A comment on a defendant's post-arrest silence violates the Fifth Amendment prohibition against self-incrimination. *Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim. App. 1995). The trial court correctly determined that the question was designed to bring prohibited information before the jury. It appears from the context that the State was intentionally trying to get before the jury the improper information about Myers' silence.

An improper comment does not automatically lead to reversal, however. An effective instruction to disregard will ordinarily cure its prejudicial effect. *Galvan v. State*, 324 S.W.3d 233, 237 (Tex. App.—Eastland 2010, no pet.). Generally, courts presume that the jury follows the trial court's instructions. *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009). Accordingly, the question placed before us by Myers is whether the instruction was adequate to cure the prejudicial effect of the improper comment.

An instruction to disregard will be presumed effective unless the facts of the case suggest the impossibility of removing the impression produced on the minds of the jury. *Waldo v. State*, 746 S.W.2d 750, 754 (Tex. Crim. App. 1988). The effectiveness of a curative instruction is determined on a case-by-case basis. *Johnson v. State*, 83 S.W.3d 229, 232 (Tex. App.—Waco 2002, pet. ref'd). Although not specifically adopted as definitive or exhaustive, the courts have looked to several factors to determine whether an instruction to disregard cured the prejudicial effect: (1) the nature of the error, (2) the persistence of the prosecution in committing the error, (3) the flagrancy of the violation, (4) the particular instruction given, (5) the weight of the

9

incriminating evidence, and (6) the harm to the accused as measured by the severity of the sentence. *Barnett v. State*, 344 S.W.3d 6, 24 (Tex. App.—Texarkana 2011, pet. ref'd).

The nature of the constitutional right affected is serious, the violation appeared intentional, the prohibition had previously been explicitly addressed by a motion in limine to which the State had acceded, and the question was answered while counsel was objecting. Once the trial court ruled, however, the State did not attempt to revisit the situation. The incriminating evidence is not overwhelming. There is no direct evidence to show Myers' guilt. There are no gunpowder residue swabs, no evidence confirming that the specific firearm used in the killing was in Myers' possession, no fingerprints found on either gun or ammunition, and no witnesses to the shooting. The evidence connecting Myers with the killing is inferential in nature. It consists of the proximity of Myers and of the murder weapon to the crime site, testimony that he was seen running with a long gun away from the area immediately after the shooting, and a single droplet of Espinosa's blood found on Myers' shirt.

This fifty-year-old man, with no prior convictions, was sentenced to sixty years' imprisonment for the (apparently unprovoked) killing of his sister. The visceral nature of the crime is not one that lends itself to a short sentence, even in the absence of any prior criminal history. We cannot say in this case that the error had any apparent effect on the outcome.

Finally, as quoted above, the trial court gave a thorough, solid instruction to the jury to disregard the question and answer. Under these circumstances, we conclude that the instruction was likely effective. Accordingly, we find that the instruction was sufficient to ameliorate the

10

prejudicial effect of the question and answer and that the improper question therefore did not change the outcome of the case in light of all the evidence.  The contention of error is overruled.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:     April 29, 2013
Date Decided:       May 3, 2013

Do Not Publish

11