

# NUMBER 13-13-00197-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

TERRANCE CAESAR,                                                                           Appellant,

v.

THE STATE OF TEXAS,                                                                           Appellee.

---

## On appeal from the 403rd District Court
## of Travis County, Texas.

---

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Benavides**
**Memorandum Opinion by Justice Rodriguez**

Appellant Terrance Caesar challenges his conviction for burglary of a habitation, a first-degree felony. *See* TEX. PENAL CODE ANN. § 30.02(a), (d) (West, Westlaw through 2013 3d C.S.). By two issues, appellant argues that: (1) the trial court erred in failing to find that an impermissibly suggestive photo array created a substantial likelihood of

misidentification; and (2) the judgment nunc pro tunc in this case mistakenly states that appellant pleaded true to the first enhancement paragraph in the indictment. We affirm as modified.

## I. Background

At the trial in this case, Jennifer Pinkston testified that on the morning of Sunday, July 22, 2012, she was returning home from church when she noticed a man in the front yard of her Austin, Texas home carrying a reusable grocery bag Pinkston recognized.[1] Pinkston asked the man if she could help him, but the man replied that he was merely looking for someone and then ran away. As Pinkston walked toward her home, she found a pair of socks on her front porch, which she testified was unusual. Finding the front door unlocked, Pinkston became alarmed and went to her neighbor's home to call the police. After the police arrived and confirmed that there was no one in the home, Pinkston went inside and discovered that the home had been burglarized. Pinkston and her roommates testified that the house had obviously been searched and that many belongings had been taken, including three laptops and a tablet computer.

Franck Tappa testified that on July 24, 2012, he met up with a man at a Dairy Queen in South Austin to complete the purchase of a laptop that he had arranged online through Craigslist, an online classifieds service. Tappa testified that he was purchasing the laptop for his sister who was about to begin college. When Tappa was paying the man for the computer, he noticed another man, dressed in black and wearing a hat,

---

[1] This case is before the Court on transfer from the Third Court of Appeals in Austin pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2013 3d C.S.).

2

standing in the foyer of the Dairy Queen; Tappa later identified that man as appellant. After completing the purchase, Tappa took the laptop to a local Apple Store for repair, and it was there discovered that the computer was one of the computers stolen from Pinkston's home.

Finally, there was testimony at trial that immediately after the suspicious man ran away from Pinkston's home, the Austin police received a series of 911 calls reporting a suspicious person hopping over fences and running through backyards. The officer who initially responded to Pinkston's call was dispatched to investigate the calls. He questioned people in the area about the suspicious person, who responded that they had seen a man they knew as Terrance Caesar running through the area. The officer then researched that name in his patrol car computer and found a mug shot of Caesar and learned that Caesar had family in the area. When the officer went to the family's home, he encountered a male that matched Pinkston's description in the front yard; the man immediately fled. The officer pursued the man, but was unable to apprehend him. During his pursuit, the officer found an empty bag, like the one Pinkston described. Using a photo array arranged by the police, Pinkston identified appellant as the man in her front yard that day, and Tappa identified appellant as the man with the hat standing inside the Dairy Queen.

Based on the chase incident and Pinkston's identification, appellant was arrested shortly after the computer was discovered to be stolen. He was indicted on one count of burglary of a habitation. *See id.* The indictment also included two enhancement paragraphs based on two prior felonies committed by appellant. Appellant pleaded not guilty to the charged offense.

3

Before trial, appellant filed a motion objecting to the identification testimony of any witness unless the trial court conducted a hearing, outside the presence of the jury, to determine whether, in relevant part, appellant's rights were violated by the identification procedures used by police. The trial court held the hearing immediately before trial commenced. At the hearing, Detective Eric Cleveland of the Austin Police Department testified about the procedure he used to compile the photo array shown to Pinkston and Tappa. Detective Cleveland testified that he was able to create an array with appellant's photo plus five additional photos of men who were approximately the same age as appellant and had similar skin tones, builds, and hair. Detective Cleveland testified that, of the six photos, only appellant had a distinctive birth mark on his forehead.

Next, Pinkston testified specifically about her identification of appellant in the array and her memories of the man in her front yard on the day of the incident:

| [Prosecutor]: | Okay. Now, were all the individuals in the photos males? |
|---|---|
| [Pinkston]: | Yes, they were. |
| [Prosecutor]: | Were they all African-American males? |
| [Pinkston]: | Yes, they were. |
| [Prosecutor]: | And were these photos handed to you one by one? |
| [Pinkston]: | They were given to me stacked and, yes, that was a lot of work going one by one. |
| [Prosecutor]: | Okay. So as opposed to being shown them in a group of six, you were given them in a stack and allowed to look at one at a time? |
| [Pinkston]: | Yes, that's correct. |
| | . . . . |

4

[Prosecutor]: Tell me how you went through this process. So if you are being shown photos and you have got these six photos in front of you, kind of walk us through the process of how you went through deciding if there was the suspect in this particular lineup.

[Pinkston]: I remember seeing six photos, and the first four I eliminated quickly because either their skin was too dark or because their body type looked like they were too heavyset.

[Prosecutor]: After you eliminated those four, what did you do next?

[Pinkston]: Then I had two photos remaining and I looked at them side by side. I noticed there was an unusual birthmark on one; and since I didn't notice whether there was a birthmark that day or not in the yard, I covered up the foreheads of both men with my hands like this (indicating) and I just looked at the rest of their faces.[2] And then I noticed they were making very different facial expressions from each other. One man looked extremely angry, where the other man was making a smirk on his face, kind of a smug look, and kind of looking off to the side a little bit with his eyes and that looked like the look that the man was making that day in the yard to me, that smug smirk facial expression.

[Prosecutor]: Okay. And you said that you covered up their foreheads. Did you observe a birthmark on the forehead of the individual that was in your yard that day, or did you have an opportunity to do so?

[Pinkston]: I didn't notice one, but it was hard to have an opportunity to because of the shade, the shadows from the tree that he was underneath. There may have been one. I didn't notice.

[Prosecutor]: Did he look at you straight on? Was his face at an angle as he was talking to you? Do you remember? And if you don't, that's okay.

_____

[2] Detective Cleveland testified that he observed Pinkston's photo array identification and confirmed that Pinkston was attempting to take the birth mark out of consideration as she examined the photos.

5

[Pinkston]: I'm trying to remember. I looked at him slightly at an angle, just slightly, but mostly I saw him straight on because I turned my head to the side to look at him.

[Prosecutor]: So is it fair to say that you were not able to determine that day whether or not there was a birthmark on the head?

[Pinkston]: Yes, that would be fair to say.

[Prosecutor]: Okay. And so is that why you covered up the foreheads?

[Pinkston]: Uh-huh.

[Prosecutor]: Did an officer ever insinuate to you that there may have been a birthmark?

[Pinkston]: Yes. I got a call the day of the burglary, over the course of the next maybe hour or so, saying — asking did the man that you saw have an unusual birthmark. And I said, I don't know. . . . And I wanted to make my decision independent of that conversation.

[Prosecutor]: Okay. And so when you covered up their foreheads, were you trying to eliminate that kind of idea in your head that there may have been a birthmark?

[Pinkston]: Yes, that's exactly what I was trying to do.

[Prosecutor]: I believe you said that their expression, the expression of the individual that you picked out matched the expression of the individual you saw in your yard. Describe that expression for me.

[Pinkston]: Well, I do photography on the side and so I study people's faces and their facial expressions, kind of what story they are telling through their faces, what feelings they are conveying. The feeling he seemed to be conveying to me was almost going to use the phrase like pull the wool over your eyes. It seemed like he was making this smirk, almost like a—kind of a smart-aleck sort of expression.

At this point, the prosecutor asked Pinkston if she could identify in the courtroom the man

she saw that day in her front yard, and she pointed to appellant.   Pinkston confirmed that her identification was "based upon [her] observations of him at the time of the offense."

At the conclusion of the hearing, the trial court ruled that the photo array shown to Pinkston was impermissibly suggestive but then concluded, "[T]he next question is whether [Pinkston's] identification is made independent of [the suggestive birth mark], and I think that the evidence indicates that, in fact, she went to some length to make sure that happened."   In short, the trial court ruled that the suggestive nature of the array was not the basis for Pinkston's identification of appellant.   The case then proceeded to trial.

At trial, Pinkston testified similarly about the method she used to identify appellant. Tappa also testified about his identification of appellant.   On direct examination, Tappa testified that he was able to identify appellant with eighty-percent certainty because of what Tappa characterized as a scar; Tappa testified that the man he saw standing outside the Dairy Queen the night he bought the laptop had a distinctive scar on his forehead. On cross-examination, Tappa testified that he passed right by the man on his way out the door and that the man's demeanor intimidated him, so he walked quickly to his car and drove away.   Tappa testified that when he looked back as he was leaving the restaurant, the man had walked inside and was interacting with the person who sold Tappa the laptop.   The following exchange then occurred between Tappa and defense counsel:

> [Defense counsel]:   Do you think that [the birthmark] was the primary thing that identified the individual to you when you were looking through the array?
>
> [Tappa]:   That was, yes, and also the—I was going to say the look, his face, the eyes.
>
> [Defense counsel]:   The eyes.   The shape of the eyes?

[Tappa]: Yeah, the shape of the eyes, the way he—you know, just the way he is staring.   That is kind of what it was.

[Defense counsel]: Okay.   When you saw him for that brief moment, that suspect going through the foyer, how long was your interaction?   How long were you face-to-face with him?

[Tappa]: I was going out, he was standing there, just sitting and standing and staring, and then I walked by and I looked at him.   You know, I looked at him and walked out until I was about 20, 30 feet away and then looked back and, you know, that was about it.

[Defense counsel]: Okay.   But I'm trying to figure out the amount of time that you were in the foyer with him?

[Tappa]: I would say 10, 20 seconds max.

[Defense counsel]: So less than 10 seconds?

[Tappa]: I would say — yeah, I'm not sure.

Finally, Tappa confirmed to defense counsel that the man's hat had not obscured the scar or mark on his forehead.

The State presented the remainder of its evidence, including testimony by an expert that the socks found on Pinkston's front porch were tested for DNA and that appellant could not be ruled out as a source of the DNA.   The parties then presented their closing arguments.   The State made the following statements specific to the identification issue:

And so [Pinkston] tells you, you know, it was—the sun was high up that day, I remember that the sun was kind of coming through the trees, the canopy there; and I didn't get a very clear view of his face, but, I mean, I knew what he looked like, I could give a description of him.

. . . .

So then we hear that [the initial investigating officer] calls Jennifer

8

Pinkston later on and he says, hey, this guy, do you remember if he had a birthmark on his head? And she says, it's possible. She doesn't say no and she doesn't say yes. She told you, I really couldn't tell. I mean, I couldn't tell based on the sun, the way that the light was that day. I really couldn't tell so I wasn't going to say yes, but I couldn't say no. I couldn't rule it out.

And the Defense is going to argue, I anticipate, that that's the big sticking point here, that she didn't see the birthmark; the birthmark is predominant, she should have seen it; if she didn't see it, then there is no way it could be him. I would suggest to you that the evidence shows otherwise.

. . . .

We heard also from Detective Cleveland who told you that he started, you know, piecing the evidence together, he went through [the initial investigating officer]'s report, and he was able to put a lineup together. He calls Jennifer Pinkston in the next day. So July 23rd, the very next day, she comes in, she looks at the lineup and—which was given to her by a different officer, Detective Crozier, so there was no suggestion. And she tells you . . . . She looks through the lineup, and she picks out Terrance Caesar. The important thing is that Jennifer told you, yes, I knew that Borunda had told me that there was a particular—there was a possibility there might be a birthmark. And she said, I didn't want that to influence me in any way so I put my hands over the foreheads of the individuals and that's how I determined, and I determined based on the expression on his face.

Who else did you hear that from? Franck Tappa. He said he had that smug, smirkness [sic] on his face and that's what made me pick him out of the lineup. Because that's what he looks like when he is involved in criminal activity, he's got that smirk, that smug look on his face, like you're not going to catch me, you can't do anything to me. And they both picked him out of the lineup based on that. I think that is really interesting.

. . . .

So [Tappa and the Craigslist contact] meet up . . . at the Dairy Queen and, you know, Mr. Caesar has somebody else do his dirty work for him. He has a younger kid go in, meets with Mr. Tappa, makes the exchange, but Mr. Tappa sees Mr. Caesar. [Appellant] kind of gives [Tappa] that weird feeling. [Tappa] says, I just—I don't know what it was, I looked back at him. And he got a good look at him. He saw he had that hat on with the flipped up bill and he saw the birthmark on his head, and it stuck out to him. He thought, man, you know, that look on his face. And, yes, he

9

picked him out of the lineup.

In his argument, defense counsel called into question the reliability of Pinkston and Tappa's identifications of appellant. Counsel also emphasized appellant's birthmark. He pointed out that appellant was the only person in the photo array who had a birthmark. He argued that appellant's birthmark was his most distinguishable feature, and because appellant was the only person in the array with such a mark, Pinkston and Tappa's identifications were irreparably tainted by that fact.

Finally, in its closing response, the State emphasized that the jury must consider the totality of the circumstances. It then made the following statement about the identification issue:

> What's the first thing we have? We have a man matching Mr. Caesar's description in that front yard with a bag that came from inside the house. [Defense counsel] is making this huge deal about Jennifer Pinkston's—how she viewed him, what angle was it, this, that, or the other, and then the birthmark. And she told you how she covered up their foreheads because she didn't want it to factor in. She said, I didn't describe him with a birthmark; I'm not saying yes or no, but I'm going to eliminate that in my choice.
>
> And it is real interesting, you didn't hear it from us, you didn't hear it from [defense counsel], you heard it from both civilian witnesses how they identified him, that unique look on his face.

The jury then returned a verdict of guilty and sentenced appellant to eighteen years' incarceration. This appeal followed.

## II. Photo Array

By his first issue, appellant argues that the trial court erred in refusing to find that the impermissibly suggestive photo array shown to Pinkston and Tappa created a substantial likelihood of misidentification. We disagree.

10

We review de novo the question of whether a pretrial identification procedure was impermissibly suggestive. *Gamboa v. State*, 296 S.W.3d 574, 581 (Tex. Crim. App. 2009). Reliability is the linchpin in determining the admissibility of an identification. *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999). In our review, our first inquiry is whether the pretrial identification procedure was impermissibly suggestive. *Gamboa*, 296 S.W.3d at 581. If we conclude that the procedure was impermissibly suggestive, we then determine if the impermissibly suggestive nature of the pretrial line-up gave rise to a substantial likelihood of irreparable misidentification. *Id.* at 581–82. In other words, if the pretrial procedure is found to be impermissibly suggestive, identification testimony would still be admissible where the totality of the circumstances shows no substantial likelihood of misidentification. *See Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008) (citing *Ibarra*, 11 S.W.3d at 195). Appellant must show by clear and convincing evidence that the identification has been irreparably tainted before his conviction can be reversed. *See Barley v. State*, 906 S.W.2d 27, 34 (Tex. Crim. App. 1995).

In this case, the trial court determined at a pretrial hearing that the photo array shown to Pinkston and Tappa was impermissibly suggestive. Therefore, the only question before us is whether appellant has shown by clear and convincing evidence that these procedures gave rise to a substantial likelihood of irreparable misidentification. We consider the following factors when determining the likelihood of irreparable misidentification: (1) the witness's opportunity to view the perpetrator at the time of the offense; (2) the witness's degree of attention during the offense; (3) the accuracy of the witness's prior description of the perpetrator; (4) the witness's level of certainty regarding

11

the identification at the time of confrontation; and (5) the lapse of time between the offense and the subsequent confrontation. *Gamboa*, 296 S.W.3d at 582; *Luna*, 268 S.W.3d at 605. Here, there were sufficient indicia of reliability in Pinkston and Tappa's identifications such that we cannot conclude there was a substantial likelihood of irreparable misidentification in this case. *See Ibarra*, 11 S.W.3d at 195; *see also Luna*, 268 S.W.3d at 605.

As to the first factor, Pinkston's interaction with the man outside her home that she later identified as appellant was not insubstantial. She had a brief conversation with him about his purpose in her yard. Although it is true that the man was standing in the shade of a tree, Pinkston testified that he was only a short distance from her, ten to twenty feet away. Tappa testified that he walked quickly by the man in the Dairy Queen foyer he later identified as appellant. However, Tappa passed very closely to the man when he did so.

As to the second factor, the testimony of both Pinkston and Tappa showed that their degree of attention during their initial interactions with appellant was heightened. Both recalled specific details concerning the man they later identified as appellant. While Tappa did home in on what he believed was a scar on the man's forehead, both witnesses were particularly struck by the man's overall demeanor. Tappa felt intimidated by the man in the foyer, noting, in particular, the man's "look, his face, the eyes" and "just the way he [was] staring." Pinkston testified that the man in her front yard had a "smug smirk facial expression," "kind of a smart-aleck sort of expression." Pinkston testified that the man in the photo array that she chose had that same expression.

As to the third factor, the record shows that Pinkston's initial description of the man

12

later identified as appellant was accurate but not specific.  When the initial investigating officer asked Pinkston to describe the man in her front yard, she stated he was an African-American male in his thirties with short hair and wearing a white t-shirt and black shorts.  Although it is true that appellant is an African-American male and at the time of the offense was in his thirties and had short hair, we cannot conclude that these unspecific characteristics are relevant.  Tappa gave no initial description of the man in the Dairy Queen foyer; his first identification of the man occurred during the photo array procedure at the police station.  In short, we cannot conclude that this third factor weighs in favor of reliability.

As to the fourth factor, Pinkston testified that she was ninety-percent certain that her identification was correct, explaining that this was "as sure as [she was] going to get" because she believed "nothing is ever 100 percent."  Tappa testified that he was eighty-percent certain.

Finally, as to the fifth factor, Pinkston's identification of appellant in the photo array happened on the same day, during the evening after the early-afternoon offense.  Tappa identified appellant in the photo array the day after he bought the computer at the Dairy Queen.

Considering the witnesses' identifications under the totality of the circumstances, we cannot conclude that appellant proved by clear and convincing evidence a substantial likelihood of misidentification from the use of the suggestive photo array.  Most notably, the testimony of both witnesses shows a high degree of attention to detail.  Pinkston gave a detailed description of the man in her front yard that focused specifically on his demeanor and facial expression; she then used a meticulous procedure to ensure that

13

her view of the photos in the array did not give undue weight to unusual physical features, i.e., the birthmark, and instead focused on the expression she saw on the day of the offense. Although Tappa gave more weight to the birthmark in his identification, we believe his identical description of appellant's demeanor served mainly to increase the reliability of Pinkston's identification. Both witnesses had a good opportunity to view the perpetrator: Pinkston in a prolonged interaction in her front yard, and Tappa by passing very close to the man in the Dairy Queen foyer. Both witnesses testified as to a high degree of certainty and both made their photo-array identifications soon after their initial observations. Finally, having reviewed the closing arguments in their entirety, we cannot say that the State particularly emphasized appellant's birthmark; the State specifically exhorted the jury to consider the totality of the circumstances and gave equal, if not greater weight, to the witnesses' descriptions of appellant's demeanor and facial expressions.

In short, the record does not show that the identification of appellant was irreparably tainted by the impermissibly suggestive photo array shown to Pinkston and Tappa. The trial court did not err in concluding as much. Appellant's first issue is overruled.

### III. Modification of Judgment Nunc Pro Tunc

By his second issue, appellant complains that, although the State abandoned the first enhancement paragraph and proceeded only on the second, his judgment of conviction incorrectly notes that he pleaded true to both enhancement paragraphs. The State concedes that this is true, and our review of the record confirms this. Appellant's second issue is sustained. Because we have the necessary data and evidence for

14

reformation, we modify the trial court's nunc pro tunc judgment to reflect that the State abandoned the first enhancement paragraph. *See* TEX. R. APP. P. 43.2; *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993) (en banc).

## IV. Conclusion

We affirm the judgment as modified.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
12th day of June, 2014.