Opinion filed September 30, 2014



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00264-CR

_____

## RICHARD EFREN HIGNOJOS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 244th District Court**

**Ector County, Texas**

**Trial Court Cause No. C-38,608**

### M E M O R A N D U M   O P I N I O N

The jury convicted Richard Efren Hignojos of four counts of aggravated assault with a deadly weapon and assessed his punishment at confinement for sixteen years for each count. The trial court sentenced Appellant accordingly, and it ordered that the sentences run concurrently. We reverse and remand.

After the trial had started, it was discovered that, during voir dire, a member of the jury had failed to disclose his relationship with one of the witnesses. Appellant moved for a mistrial, and the trial court denied that motion. In his first point of error, Appellant asserts that the trial court thereby erred. Because we agree with Appellant and because we cannot find that the error is harmless, there is no need for us to reach other points that he has presented to us.

Although there is no challenge to the sufficiency of the evidence, we will summarize the relevant testimony in order to provide context for Appellant's first point. The events out of which the charges in this case arose occurred at the home of Adrian Nunez during a party complete with loud music, strobe lights, and glow sticks and ultimately attended by some twenty-five people.

Nunez lived in a trailer just outside Odessa. At around 11:30 on the night before the early morning assault took place, Appellant and his brother Sonny Hignojos met some friends at the party at Nunez's house. There were not many people there, and after about an hour, Appellant, Sonny, and some of the friends whom they had met there left and went to a different party. The second party fizzled after about an hour, and Appellant, Sonny, and others who had gone there with them left and returned to the party at Nunez's house. Those who were with Appellant when they returned to the party included Sonny, Bobby Herrera, Jacob Garcia, Brianna Alvarado, and Savannah Evaro.

The testimony shows that several women decided to go to the party at Nunez's house. One of those women testified that there were some men outside Nunez's trailer when the women arrived. Apparently, the men were not welcome at the party and were not happy about that. Another of the women said that the men were upset because two girls that were with the men had been told to leave the party. Yet another of the women testified that Nunez had told the entire group to leave because the other women at the party did not want any of them there.

2

The evidence also is conflicting as to what happened next at Nunez's trailer, and it is difficult to tell who was where and who was doing what and when they were doing it. Suffice it to say that an argument ensued and that at least some of the people who were there with Appellant were asked to leave the party.

As they were leaving, someone closed the door to Nunez's trailer before Sonny was able to get outside. After Sonny had been left inside, Appellant went to the door on the front porch. Cassandra Rivera was standing on one side of the doorway, and Appellant was either on the other side of the doorway, in the doorway, or just inside Nunez's trailer. According to Appellant, Cassandra pushed him into the hallway and "started swinging." Cassandra hit Appellant on the left side of his face, and Appellant hit her back. Appellant said that another woman, Roxana Payan, was hitting him from the side and that, at that time, he heard a gunshot to his right. Appellant said that he did not have a gun and that he did not know of anyone who had a gun. Appellant testified that, as he and Cassandra were fighting, he saw Cassandra get hit in the head and fall down, but he did not know who hit Cassandra because he was still fighting Roxana. After the initial gunshot, Nunez said, "[G]et out of here." Appellant and some of the other people went to their vehicles. As Appellant was getting in his vehicle, he heard more gunfire, and he could still hear gunfire as he drove away.

Cassandra testified that someone hit her with a metal object but that she did not know who hit her. Some witnesses testified that Appellant hit her with a handgun. Other witnesses said that Appellant hit Cassandra with his fists. The record contains testimony that Appellant fired a gun. Appellant and other witnesses testified that he did not fire a gun that night. And yet another witness testified that she did not see anyone with a gun and that she did not see the fight. Leslie Olivarez and Savannah saw Sonny with a gun, but they did not testify that they saw Sonny either with the gun inside the trailer or hit anyone with it. Bobby

3

testified that he did not see Appellant with a gun but that he saw Sonny hitting people with a gun during the fight. Sonny told detectives that he was not even at the party. Others testified that he was at the party. One witness testified that it was Bobby who had the gun.

Four of the women at the party went to the emergency room. Two of them had gunshot wounds, and the other two had suffered other injuries. All four of the women were released by morning.

Mike Finnerty, a crime scene investigator for the Ector County Sheriff's Department, testified that he found five shell casings outside the trailer. Inside, he found one fired round, three bullet fragments, and more than twenty-five bullet holes. There was no evidence as to whether the rounds were fired from the same gun or from different guns, and there was no testimony as to the total number of rounds fired.

A jury was selected and seated, and the testimony began. After the State had completed its case-in-chief, Appellant called various witnesses, including Bobby Herrera. Bobby was the last witness called by the defense and the first witness of that day. Prior to Bobby's testimony, Bobby's mother saw Juror Ramirez come in with the jury. She told defense counsel about "a negative strained relationship" between Juror Ramirez and Bobby. That is the relationship that Juror Ramirez had not mentioned during the voir dire examination of the jury and that was the subject of Appellant's motion for mistrial.

When Appellant's lawyer found out about the relationship, he told the trial court about it. He informed the trial court that he was "[j]ust 100 percent sure[ ] that one or both would have used a preemptory (sic) strike" even if the juror had not revealed "any bias one way or the other." The State suggested that the trial court conduct a hearing to "inquire into that relationship."

4

During a hearing outside the presence of the jury, the trial court informed Juror Ramirez that they were aware of his relationship with Bobby, and the following exchange occurred:

THE COURT: . . . . Mr. Ramirez have a seat, sir. We've called you in here because it was brought to our attention that you may know Bobby Herrera who is going to be called to testify.

JUROR RAMIREZ: Yes, sir, I know both of them, yes, sir.

THE COURT: Is there some reason you didn't bring that to the Court's attention when you were asked by [the State] and [the defense] during the voir dire?

JUROR RAMIREZ: I heard him say something about Bobby was going to be there, but since I knew he was detained for something - - some stuff he had done in the past, so, you know, I said, well, I had no problem with that. I saw him walking this morning over there and as he was walking he looked at me.

THE COURT: And you saw it was the same one?

JUROR RAMIREZ: Yeah. So I was - - that's one of the reasons, but, you know, I could be dismissed, you know.

THE COURT: Well, here is what I need to talk to you about - -

JUROR RAMIREZ: Yes, sir.

THE COURT: - - you remember my instructions that said do not tell other jurors your own personal experiences nor those of other persons nor relate any special information?

JUROR RAMIREZ: Yes, sir.

THE COURT: Also, a juror may have special knowledge of matters - - in this case, you may know - - know a witness or you may know what has happened in this or some other case, to tell the other

jurors of this information would be a violation of these instructions. You understand that?

THE COURT: Now, do you believe that you can sit on the jury and listen to the testimony of Mr. Herrera and make - - still be a fair and impartial juror and make your decision when you go back to deliberate based upon the evidence that was presented here in the courtroom during the course of this trial?

JUROR RAMIREZ: Yes, sir.

THE COURT: You don't think you'll have any problem with that?

JUROR RAMIREZ: No, sir. No

THE COURT: Very well. Then I think we will proceed with the trial.

[DEFENSE COUNSEL]: May I ask him some questions, Judge, even based on - - for purposes of the record?

THE COURT: I think the record is pretty clear. Approach the bench. Mr. Ramirez, go ahead and have a seat in the jury box right now, just right up there.

(At Bench, discussion on the record)

[DFENSE COUNSEL]: I haven't had this come up very often over the years, but I think it's important for me to be able to ask him questions about if he would have been asked a question earlier, would he have raised his hand to say that he might have some problems with one of the witnesses, go ahead and get him through just a couple of questions into, *is there a bad relationship between him and that person, has he said he never wants to see that person again, that person being Bobby Herrera*, so that I can make a motion based on what he - - he may say nothing, but he may say something that would

6

cause me to make a motion for mistrial that the Court would have to rule on.

Given the facts that we know - - that I know from my side, so I would like to be able to ask him, just like you would do if someone approached and said, Judge, I've got this problem, and you would ask if either one of us had questions.

THE COURT: I'll ask the questions.

(Open court . . .)

THE COURT: You may just keep your seat there, Mr. Ramirez. Have you had any type of relationship with Mr. Herrera in the past five years?

JUROR RAMIREZ: No, sir.

THE COURT: Social or any other?

JUROR RAMIREZ: No, I just - - I mean, nothing verbal or anything.

THE COURT: All right.  And is there anything about him that would cause you difficulty in serving as juror and completing your service on this case?

JUROR RAMIREZ: Well, I don't - - I don't think it would jeopardize anything, you know, between my wife and him, you know, because I hardly know him, you know, I don't - - it's not somebody I communicate, you know, constantly, you know.  I've just known him because he's related to my wife, but that's all, you know - -

THE COURT: All right.

JUROR RAMIREZ:  - - not been in contact or anything.

THE COURT: So thinking of that and thinking of your history with him and your family, is there anything that you could think of that would affect your ability to sit in this case and follow these

7

instructions that I've given to you now twice, that is to consider the evidence and make your decision based upon the evidence presented in the court - -

JUROR RAMIREZ: Right.

THE COURT: Can you do that?

JUROR RAMIREZ: Yes, sir.

[DEFENSE COUNSEL]: For the record, we would ask the Court to specifically ask him if there's any concern, whatsoever, No. 1, is there any concern, whatsoever, about the impact on the relationship with his wife, after all, he's the uncle, and No. 2, *if there was ever a situation where he stated to members of Bobby Herrera's family that he did not want Bobby to be around them - around his family at all because of what Bobby has gotten into, obviously, Bobby is in prison and has violated the law and been found guilty* either by guilty plea or by verdict, I would ask the Court to ask those two questions.

THE COURT: I think Mr. Ramirez has already indicated that he's already related to the Court about the family, about the - - he's already addressed the issue about his wife, said that that's not going to affect his ability to serve as a fair juror and to follow the rules.

You are satisfied - - again, you've heard [defense counsel], are you satisfied that there's nothing out there in your history with this man or his history with your family or him, whatever the family relationship is, anything, is there anything out there that would affect your ability to receive his testimony, give it - - make your evaluation of his testimony applying - - giving the value and weight, whatever it may deserve, just like you are going to give value and weight to the testimony of any other witness and then go back and deliberate and make a decision, can you do that?

JUROR RAMIREZ: Yes.

THE COURT: Is there anything out there that gives you concern?

8

JUROR RAMIREZ: No, I'm just an uncle, you know, on my wife's side, but other than that, I don't have no contact with - - no communication with him, whatsoever.

THE COURT: Very well. All right. Well, we needed to ask you these questions, Mr. Ramirez, before we proceeded because we want to make sure that the jury members can be fair to both sides and can receive and be fair and consider all the evidence that's presented, every bit, so that's all we would ask of you.

JUROR RAMIREZ: I can be a fair juror.

THE COURT: Very well, then, Mr. Ramirez may return to the jury room with the remainder of the jury panel (emphasis added).

Appellant then moved for a mistrial, and the trial court denied it. The trial court said, "[T]here's nothing about his relationship with Mr. Herrera that would affect his ability to be fair to both sides."[1]

We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009). When we review a ruling for an abuse of discretion, we do not substitute our judgment for that of the trial court but, rather, decide whether its decision was arbitrary or unreasonable. *McQuarrie v. State*, 380 S.W.3d 145, 150 (Tex. Crim. App. 2012). A trial court abuses its discretion when "no reasonable view of the record could support its ruling." *Okonkwo v. State*, 398 S.W.3d 689, 694 (Tex. Crim. App. 2013).

The Sixth Amendment guarantees the right to a trial before an impartial jury. That right includes the ability to conduct "an adequate voir dire to identify

---

[1]The sole alternate juror who was selected in this case had already replaced a different juror who was determined on the first day of trial to be disqualified. Therefore, the remedy available to Appellant was a mistrial.

unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992); *see also* U.S. CONST. amend. VI. Essential to the Sixth Amendment guarantee to a trial before an impartial jury is the right to question members of the venire so that the parties can intelligently exercise peremptory challenges as well as challenges for cause. *Franklin v. State*, 138 S.W.3d 351, 354 (Tex. Crim. App. 2004) (*Franklin II*).

"The voir dire process is designed to insure, to the fullest extent possible, that an intelligent, alert, disinterested[,] and impartial jury will perform the duty assigned to it." *Salazar v. State*, 562 S.W.2d 480, 482 (Tex. Crim. App. 1978); *see also* TEX. CONST. art. I, § 10 ("In all criminal prosecutions the accused shall have a speedy public trial by an impartial jury."). Both parties have a right to question the jury panel to expose bias in order to intelligently exercise peremptory strikes. If a potential juror withholds information that is material, the parties' exercise of challenges and peremptory strikes is hampered. *Franklin v. State*, 12 S.W.3d 473, 477–78 (Tex. Crim. App. 2000) (*Franklin I*).

To establish error, "the defendant must show that the juror withheld material information during voir dire" and that it was withheld "despite due diligence exercised by the defendant." *Franklin II*, 138 S.W.3d at 355–56. The withheld information is material if the nature of the relationship reveals a potential for bias or prejudice. *See Decker v. State*, 717 S.W.2d 903, 907 (Tex. Crim. App. 1986). The accused does not have to establish "that the concealed information show[s] actual bias; just that it has a tendency to show bias." *Franklin II*, 138 S.W.3d at 356. Bias is "an inclination toward one side of an issue rather than to the other," that supports a "natural inference" that the juror will not act impartially. *Anderson v. State*, 633 S.W.2d 851, 853 (Tex. Crim. App. [Panel Op.] 1982) (quoting *Compton v Henrie*, 364 S.W.2d 179, 182 (Tex. 1963)). Prejudice is prejudgment. *Id.*

10

In *Franklin*, a sexual assault of a child case, a juror did not recognize the child victim's name when it was mentioned during voir dire. However, during trial the juror recognized the child's face when the child took the stand. *Franklin I*, 12 S.W.3d at 476. The juror was the assistant leader of the child's Girl Scout troop, and the juror's daughter was also in that troop. *Id.* The juror told the trial court that she could base her judgment solely on what she heard in court. Nevertheless, the defendant moved for a mistrial. He argued that he would have exercised a peremptory strike if the juror had disclosed the relationship during voir dire. *Id.* The trial court refused to allow the defendant to question the juror about her relationship with the victim. *Id.* The defendant objected and told the trial court that he would have asked about the nature of the relationship, how long it lasted, whether the juror "could set aside any of her relationship," and "whether she would tend to give more credence or less credence to [the child]'s testimony and truthfulness due to that relationship." *Id.* (emphasis omitted).

Ultimately, the case reached the Court of Criminal Appeals. That court wrote that the fact that a juror "had a relationship with the victim, one that many people would consider almost a parental role, certainly has a tendency to show bias." *Franklin II*, 138 S.W.3d at 356. The defendant "was not permitted to determine the extent of the relationship between [the victim] and [the juror] *due to no fault of his own*" because the juror had not responded during voir dire when asked if anyone knew the victim. *Franklin I*, 12 S.W.3d at 478. The defendant had acted on the answers given to him during voir dire and was thus deprived of the opportunity to exercise a challenge for cause or to use a peremptory strike. *Id.* Although the juror said that she could be fair and impartial, that fact is not dispositive of the issue if the information is material and likely to affect the juror's verdict. *Id.* The trial court prevented the accused from exploring the nature of the juror's relationship with the victim. *Id.* Because the accused was deprived of the

opportunity to question the juror both during voir dire and during trial to determine the nature of the relationship, the court could not conclude that the juror's relationship with the victim "was immaterial to the appellant's questioning of [the juror] or appellant's use of peremptory strikes." *Id.* at 478–79.

Here, the State asked the venire if anyone recognized Appellant or the defense attorneys and then the State told the venire that it had "quite a few witnesses." The prosecutor asked the panel members whether they knew anyone from a list of witnesses that he called out. He explained, "If you see a familiar name or something, let me know, we'll talk about it so we can go through it." When the prosecutor called out the name, "Bobby Herrera," Veniremember Morales indicated that he might know Bobby. Juror Ramirez said nothing. After Morales acknowledged that he might know Bobby, the following exchange occurred:

> JUROR MORALES: Bobby Herrera, I know two, the junior and senior also, I don't know if it's the same one, though.
>
> [THE PROSECUTOR]: It might be. How old is the junior?
>
> JUROR MORALES: Junior is about 21.
>
> [THE PROSECUTOR]: From here?
>
> JUROR MORALES: Yeah.
>
> [THE PROSECUTOR]: It might be. Again, come up afterwards and we'll talk about that, okay? If you knew them, if that was the person and he was in trial today in front of you, would you lend to believe him over someone else you didn't know or could you follow the law and be neutral and take his opinions, his ideas and his observations just like everyone else?
>
> JUROR MORALES: I could follow it.

The trial court dismissed the panel at the close of voir dire so that the parties could exercise the strikes. Five jurors remained to discuss various issues. When Veniremember Morales informed the court about a serious medical issue, both parties moved to strike him for cause without questioning him about the nature of his relationship with Bobby. There is no evidence in the record that Juror Ramirez ever indicated that he knew Bobby or that he was related to him by marriage. Thus, Appellant was not able to determine whether a relationship existed between Juror Ramirez and Bobby, much less discover the nature of that relationship. That was through no fault of his own, and he was deprived of the opportunity to use a peremptory strike or potentially even to challenge Juror Ramirez for cause. *See id.* at 478. We fail to see how Appellant could have been more diligent.

The State acknowledges that, during voir dire, Juror Ramirez failed to disclose his relationship with a witness, but it seems to contend that questioning the juror once the relationship was discovered was sufficient to establish that Juror Ramirez was not biased and, therefore, that the withheld information was not material. The State argues that this case is distinguishable from *Franklin* because the trial court held a hearing in this case and "cover[ed] the topics defense counsel identified." According to the State, "[t]he allegations of relationship bias, which originated from off-the-record remarks from somebody's mother, were nothing more than speculation."

While the trial court did conduct a hearing, we disagree with the State that the trial court "cover[ed] the topics defense counsel identified" because it did not allow Appellant to explore Juror Ramirez's relationship with Bobby. The "off-the-record remarks" from Bobby's mother were offered to show that Juror Ramirez failed to disclose during the voir dire process a potentially strained familial relationship with a defense witness and to support Appellant's request for a hearing to determine the nature and extent of that relationship. During that hearing, the

13

trial court merely asked whether Juror Ramirez had any type of relationship with Bobby within the last five years and, generally, whether there was "anything about him" or "anything out there" that would affect his ability to be fair and impartial. The fact that he had no contact with a family member during the last five years lends some support to the purported strained relationship. Defense counsel specifically asked the trial court to ask Juror Ramirez "if there was ever a situation where he stated to members of Bobby Herrera's family that he did not want Bobby to be around them–around his family at all because of what Bobby has gotten into." However, the trial court simply said, "you've heard, [defense counsel]" and asked "are you satisfied that there's nothing out there in your history . . . whatever the family relationship is, anything, is there anything out there that would affect your ability to receive his testimony?" If the trial court had asked Appellant's proposed questions, the "off-the-record remarks" would no longer have been speculative.

Regardless of whether Juror Ramirez had interacted with Bobby in the five years before trial, the record establishes that Juror Ramirez's wife and Bobby's mother were sisters. Although a juror's familiarity with a witness is not always material, when a prospective juror reveals an acquaintance with or a relation to a witness during voir dire, that places the parties on notice of an existing relationship and permits counsel to ask questions to determine the nature of that relationship. *See Decker*, 717 S.W.2d at 905. Here, Appellant was not permitted to explore the nature and extent of Juror Ramirez's relationship with Bobby either during voir dire or after the relationship was discovered.

Under these circumstances, we cannot conclude that the relationship between Juror Ramirez and Bobby was immaterial to Appellant's ability to question Juror Ramirez or to intelligently exercise peremptory strikes. Therefore, we must conclude that the trial court erred when it neither asked Appellant's

14

proposed questions nor allowed Appellant to ask the questions. We also hold that the information withheld from Appellant by Juror Ramirez was material. *See id.*

Having concluded that Juror Ramirez withheld material information during voir dire, we must reverse Appellant's conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or the punishment. TEX. R. APP. P. 44.2(a); *see also Franklin II*, 138 S.W.3d at 358. Rather than focusing on the propriety of the outcome of the trial, we must "calculate as much as possible the probable impact of the error on the jury in light of the existence of other evidence." *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). We must "take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'" *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (quoting TEX. R. APP. P. 44.2(a)) (alteration in original). "If an appellate court rules that an error is harmless, it is in essence asserting that the nature of the error is such that it could not have affected the jury." *Wesbrook*, 29 S.W.3d at 119.

The State argues that any error was harmless because "the record was sufficiently developed to show that the challenged juror . . . could deliberate the case free from bias." As discussed above, the trial court prevented Appellant from exploring the specifics of the juror's relationship with the witness, so we cannot determine that Juror Ramirez was free from bias. While Juror Ramirez said that he could be impartial, this is only one factor because a juror who claims "that the fact that he withheld information will not affect his verdict is not dispositive of the issue where the information is material and therefore likely to affect the juror's verdict." *Franklin II*, 138 S.W.3d at 354–55 (quoting *Salazar*, 562 S.W.2d at 482).

15

In other cases where a juror failed to disclose a relationship to a witness or a party, such error was found to be harmless where the defense affirmatively waived the opportunity to question the juror once the withheld information was discovered or where there was no claim that the defense would have exercised a peremptory strike differently if the information had been disclosed during voir dire. *See, e.g.*, *Sypert v. State*, 196 S.W.3d 896, 902–03 (Tex. App.—Texarkana 2006, pet. ref'd).

In this case, Appellant argued that if he or the State had been aware of the relationship between Bobby and Juror Ramirez, he was "100 percent sure[ ] that one or both would have used a peremptory strike" even if the juror had not revealed "any bias one way or the other." Appellant asked the trial court to inquire into the "strained" nature of the relationship and specifically about a conversation in which Juror Ramirez was purported to have said that he did not want Bobby around his family, but the trial court only inquired into whether Juror Ramirez had a relationship with Bobby in the last five years.

We recognize that Juror Ramirez stated several times that he could be fair and impartial regardless of his relationship and past with Bobby. "We have been warned, however, that a juror's bald statement in regard to a willingness to be fair is not dispositive of the issue where the information is material." *Franklin v. State*, 23 S.W.3d 81, 83 (Tex. App.—Texarkana 2000), *aff'd*, 138 S.W.3d 351 (Tex. 2004). Because the trial court refused to ask or allow Appellant to ask Appellant's proposed questions, we do not know the nature and extent of Juror Ramirez's relationship with Bobby and cannot determine the extent of prejudice that might have existed.

The State contends that any alleged error was harmless because Bobby's "purportedly exculpatory testimony was cumulative" of both Appellant's and Brianna Alvarado's testimony. Appellant testified that he did not have or use a gun that night, that he hit Cassandra in the face with his fists in self-defense, and

that he did not see anyone possess or fire a gun that night. Brianna testified that she did not see anyone with a gun, including Appellant, and that she did not see the fight. Bobby told the jury that Appellant did not have a gun that night, but he also testified that he saw Sonny with a gun and that he saw Sonny hitting people with the gun during the fight. Although Savannah told Detective Bass that she saw Sonny get a gun from his vehicle during the altercation, she was not present during the fight. Neither Appellant nor Brianna testified that Sonny used a gun. In fact, the prosecutor directly asked Appellant if it was his testimony that Sonny was the shooter, and Appellant said, "No, sir, it's not." Thus, Bobby's testimony is not cumulative of Appellant's and Brianna's testimony.

During closing arguments, defense counsel told the jury that Bobby's testimony was "the most important" of all the evidence it heard. The majority of Appellant's closing argument focused on why the jury should believe Bobby's testimony. Because he was the only witness who testified that he saw Sonny committing the offenses for which Appellant was on trial, Bobby's credibility was crucial to Appellant's case.

Because Bobby's credibility was vital to Appellant's defense, because Bobby's testimony was not cumulative of other defense witnesses, and because the trial court did not allow an inquiry into the specific nature of the relationship and whether it was strained, we cannot conclude beyond a reasonable doubt that the failure to disclose the relationship did not contribute to the convictions. Appellant's first issue is sustained. In light of our ruling on Appellant's first issue, we need not address Appellant's second and third issues. *See* TEX. R. APP. P. 47.1.

17

We reverse the judgments of the trial court and remand this cause to the trial court for a new trial.


JIM R. WRIGHT

CHIEF JUSTICE


September 30, 2014

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.